

FILED by _____ D.C.

MAY 21 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

A1 PROCUREMENT, LLC,

    Relator,

    v.

THERMCOR, INC;
WALTER L. DIXON;
RONALD L. DIXON
WILLIAM M. BOLEAN;
TIMOTHY BOLEAN;
DALE BARNES;
TLMG, LLC;
JOHN DOES 1-10,

    Defendants.

Civil Action No. 11-23978 (DTH)

COMPLAINT FOR VIOLATION
OF FEDERAL FALSE CLAIMS ACT,
31 U.S.C. §3729, *et seq.*

FILED UNDER SEAL

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

Relator, A1 PROCUREMENT, LLC ("A1") files its First Amended Complaint by and through its undersigned attorneys Storms and Associates, P.A. against THERMCOR, INC; WALTER L. DIXON; RONALD L. DIXON; WILLIAM M. BOLEAN; DALE BARNES; TIMOTHY BOLEAN; TLMG, LLC; and JOHN DOES 1-10 (collectively "Defendants"), pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*

### NATURE OF THE CASE

1.    This is a *qui tam* action brought by Relator A1, on behalf of the United States, against Defendants, to recover penalties and damages arising from false statements and claims regarding Defendants falsely and fraudulently misrepresenting Service-Disabled Veteran-Owned Small Businesses ("SDVOSB") status and Small Business Administration ("SBA") 8(a) status, in order to bid on, obtain award, and payment for approximately $30 million dollars in United States federal government contracts.

2.      A1 is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.

3.      From at least 2007, Defendants knowingly made, used, ratified, authorized, conspired, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of the FCA.  Defendants knowingly mislead the United States Coast Guard ("Coasts Guard"), the United States Navy ("Navy"), and numerous other federal agencies to enter into SBA 8(a) sole-source contracts and SDVOSB set-aside contracts by falsifying statements that THERMCOR, INC was an eligible SBA 8(a) participant and SDVOSB concern.   A1, the United States of America, and legitimate service-disabled veteran-owned and disadvantaged businesses have been harmed by the Defendants' false and fraudulent actions.

## PARTIES

4.      Plaintiffs are A1 and the United States of America.

5.      A1 is a federal contractor that has investigated the Defendants and brings these claims on behalf of the United States of America.

6.      The Coast Guard and the Navy are armed forces of the United States, responsible for protecting the maritime, land based, and aviation economy, environment, and defending our borders.  The Coast Guard and Navy are the contracting agencies for the majority of the acquisitions at issue in this action.

7.      Defendant THERMCOR, INC ("THERMCOR") is a Virginia corporation with a mailing address of 2601 Colley Ave Norfolk, Virginia 23517.

8.      THERMCOR has never been an eligible SDVOSB concern.

9. Additionally, at all relevant times herein, THERMCOR was not an eligible SBA (8)a sole-source contractor.

10. Defendant WALTER L. DIXON ("WALTER DIXON") is a Virginia resident, he is the President and Chief Executive Officer of THERMCOR, and he owns at least 51% of THERMCOR.

11. WALTER DIXON is not currently and has never been a Service Disabled Veteran.

12. Defendant RONALD L. DIXON ("RONALD DIXON") is Defendant WALTER DIXON's brother. RONALD DIXON is a Virginia resident, and he is THERMCOR's Vice President and Chief Operating Officer.

13. Defendant WILLIAM M. BOLEAN ("WILLIAM BOLEAN") is a Virginia resident, and he is THERMCOR's Vice President and Chief Financial Officer.

14. Defendant TIMOTHY BOLEAN is the son of WILLIAM BOLEAN. TIMOTHY BOLEAN is a Virginia resident, and he is a project manager at THERMCOR.

15. Defendant DALE BARNES is a Virginia resident, and he is the senior project manager at THERMCOR.

16. Defendant TLMG, LLC is a Virginia corporation with its principle place of business at 600 West 25 Street, Norfolk, Virginia.

17. TLMG, LLC conspired with THERMCOR and the individual Defendants by assisting THERMCOR to make the false and fraudulent statements and claims at issue herein.

18. Defendants, JOHN DOES 1-10 are unknown agents, officers, and/or employees of THERMCOR and/or TLMG, LLC who made, caused, and conspired to make false and fraudulent statements and claims to the Government. Each JOHN DOE is sued under the

fictitious names as "JOHN DOES 1-10" because their true names, titles, capacities, and/or degree of responsibility for the acts alleged herein are unknown to the Relator at this time. When the Relator ascertains this information it will amend this Complaint accordingly.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1345.

20.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), because all Defendants knowingly made, used, or caused or conspired to cause, a false record or statement material to a false or fraudulent claim on numerous United States' federal government websites;

21.     Venue is proper in the Southern District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendants have committed acts prescribed by 31 U.S.C. § 3729 in the District.

## STATUTORY AND REGULATORY FRAMEWORK

A.  The False Claims Act

22.     The FCA, 31 U.S.C. §§ 3729-3733, provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States; knowingly using a false record or statement material to a false claim; or conspiring to commit either of the above. 31 U.S.C. § 3729(a)(1)(A)-(C). During the relevant time period, the FCA provided, in pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States of the United States a false or fraudulent claim for payment or approval; [or]

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;[1]
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

(a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

31 U.S.C. §3729(a)(1)(A)-(C).

23.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999.

24.    Pursuant to the Small Business Size and Status Integrity regulations, 15 U.S.C. § 632(w), known as the *presumption of loss* rule, the Defendants' liability and damages under the FCA shall be determined and calculated based on a presumption of loss to the United States equal to the total amount expended on each contract where it is established that the Defendants willfully sought and received the award by misrepresentation or fraud. The *presumption of loss* rule provides in pertinent part:

**(w) Presumption**
**(1) In general**
In every contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant whenever it is established that a business concern

---

[1] The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Section 3729(a)(1)(B) was formerly Section 3729(a)(2), and is applicable to this case by virtue of Section 4(f) of FERA, while Section 3279(a)(1) of the statute prior to FERA, and as amended in 1986, remains applicable here.

other than a small business concern willfully sought and received the award by misrepresentation.

**(2) Deemed certifications**
The following actions shall be deemed affirmative, willful, and intentional certifications of small business size and status:

**(A)** Submission of a bid or proposal for a Federal grant, contract, subcontract, cooperative agreement, or cooperative research and development agreement reserved, set aside, or otherwise classified as intended for award to small business concerns.

**(B)** Submission of a bid or proposal for a Federal grant, contract, subcontract, cooperative agreement, or cooperative research and development agreement which in any way encourages a Federal agency to classify the bid or proposal, if awarded, as an award to a small business concern.

**(C)** Registration on any Federal electronic database for the purpose of being considered for award of a Federal grant, contract, subcontract, cooperative agreement, or cooperative research agreement, as a small business concern.

15 U.S.C. § 632(w).

25.     The FCA allows any person having information about a false or fraudulent claim against the Government to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

B.  The Federal Government's SDVOSB Set-Aside Program

26.     The Veterans Benefits Act of 2003 (Public Law 108-83) established a procurement program for SDVOSB concerns.  The program sets aside and sole sources Federal contracts to SDVOSB concerns, and gives preferences to SDVOSB concerns in non-SDVOSB contracts.  To be eligible for SDVOSB set-aside or sole source contracts, or to register on a Federal website as an SDVOSB concern for procurement preferences in non-SDVOSB set-aside contracts— a business must be at least 51% directly owned and controlled by an individual who,

at the time the representation is made, is considered by the Government to be a Service-Disabled Veteran.

27.     Prior to bid submission and award of a SDVOSB set-aside or sole source contract, the contractor is required to represent that it an eligible SDVOSB concern in several Federal government databases, including, the United States' Central Contractor Registration ("CCR") website; the United States' Online Representations and Certifications Applications ("ORCA") website; and the United States' System for Award Management ("SAM") website.

28.     The contracting officer in charge of the contract relies on the contractor's self-representations in the CCR, ORCA, and SAM databases prior to awarding the contract to the bidder.

29.     In order to represent SDVOSB status, a contractor must comply with all SBA regulations. The applicable SBA regulations are provided in pertinent part below:

30.     **Subpart A—Definitions for the Service-Disabled Veteran-Owned Small Business Concern Program. 13 C.F.R. § 125.8 What definitions are important in the Service-Disabled Veteran-Owned (SDVO) Small Business Concern (SBC) Program?**

(a) Contracting Officer has the meaning given such term in section 27(f)(5) of the Office of Federal Procurement Policy Act (41 U.S.C. 423(f)(5)).

(b) Interested Party means the contracting activity's contracting officer, the SBA or any concern that submits an offer for a specific SDVO contract.

(c) Permanent caregiver is the spouse, or an individual, 18 years of age or older, who is legally designated, in writing, to undertake responsibility for managing the well-being of the service-disabled veteran, to include housing, health and safety. A permanent caregiver may, but does not need to, reside in the same household as the service-disabled veteran. In the case of a service-disabled veteran lacking legal capacity, the permanent caregiver shall be a parent, guardian, or person having legal custody. There may be no more than one "permanent caregiver" per service-disabled veteran.

(d) Service-Disabled Veteran with a Permanent and Severe Disability means a veteran with a service-connected disability that has been determined by the U.S.

Department of Veterans Affairs to have a permanent and total disability for purposes of receiving disability compensation or a disability pension.

(e) Service-Connected has the meaning given that term in section 101(16) of Title 38, United States Code.

(f) Service-disabled veteran is a veteran with a disability that is service-connected.

(g) SBC owned and controlled by service-disabled veterans (also known as a Service-Disabled Veteran-Owned SBC) is a concern—

(1) Not less than 51% of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51% of the stock of which is owned by one or more service-disabled veterans;

(2) The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran; and

(3) That is small as defined by § 125.11.

31.  **Subpart B—Eligibility Requirements for the SDVO SBC Program 13 C.F.R. § 125.9. Who does SBA consider to own an SDVO SBC?**

A concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans.  More specifically:

(a) Ownership must be direct.  Ownership by one or more service disabled veterans must be direct ownership.  A concern owned principally by another business entity that is in turn owned and controlled by one or more service-disabled veterans does not meet this requirement.  Ownership by a trust, such as a living trust, may be treated as the functional equivalent of ownership by service-disabled veterans where the trust is revocable, and service-disabled veterans are the grantors, trustees, and the current beneficiaries of the trust.

(b) Ownership of a partnership. In the case of a concern which is a partnership, at least 51% of every class of partnership interest must be unconditionally owned by one or more service-disabled veterans. The ownership must be reflected in the concern's partnership agreement.

(c) Ownership of a limited liability company.  In the case of a concern which is a limited liability company, at least 51% of each class of member interest must be unconditionally owned by one or more service-disabled veterans.

(d) Ownership of a corporation. In the case of a concern which is a corporation, at least 51% of the aggregate of all stock outstanding and at least 51% of each class of voting stock outstanding must be unconditionally owned by one or more service-disabled veterans.

32. **Subpart C—Contracting with SDVO SBCs. 13 C.F.R. § 125.14. What are SDVO contracts?**

SDVO contracts are contracts awarded to an SDVO SBC through a sole source award or a set-aside award based on competition restricted to SDVO SBCs.

33. **13 C.F.R. § 125.15 What requirements must an SDVO SBC meet to submit an offer on a contract?**

(a) Representation of SDVO SBC status. At the time an SDVO SBC submits its offer on a specific contract, it must represent to the contracting officer that:

(1) It is an SDVO SBC;
(2) It is small under the NAICS code assigned to the procurement;
(3) It will meet the percentage of work requirements set forth in § 125.6

34. **Subpart E—Penalties and Retention of Records. 13 C.F.R. § 125.29 What penalties may be imposed under this part?**

(a) Suspension or debarment. The Agency debarring official may suspend or debar a person or concern pursuant to the procedures set forth in part 145 of this chapter. The contracting agency debarring official may debar or suspend a person or concern under the Federal Acquisition Regulation, 48 CFR Part 9, subpart 9.4.

(b) Civil penalties. Persons or concerns are subject to severe civil penalties under the False Claims Act, 31 U.S.C. 3729–3733, and under the Program Fraud Civil Remedies Act, 331 U.S.C. 3801–3812, and any other applicable laws.

(c) Criminal penalties. Persons or concerns are subject to severe criminal penalties for knowingly misrepresenting the SDVO status of a SBC in connection with procurement programs pursuant to section 16 of the Small Business Act, 15 U.S.C. 645, as amended; 18 U.S.C. 1001; and 31 U.S.C. 3729–3733. Persons or concerns also are subject to criminal penalties for knowingly making false statements or misrepresentations to SBA for the purpose of influencing any actions of SBA pursuant to section 16(a) of the Small Business Act, 15 U.S.C. 645(a), as amended, including failure to correct ''continuing representations'' that are no longer true.

35.    Pursuant to Public Law 108-83, FAR 19.11, and the Coast Guard's and Navy's policies, these agencies rely on contractor's CCR, ORCA, and SAM SDVOSB self-representations when awarding SDVOSB set-aside contracts as well as to provide bid preferences to SDVOSB concerns in non-SDVOSB contracts.

## C. The SBA's 8(a) Minority Sole-Source Program

36.    The SBA's 8(a) Minority Sole-Source Program is intended to assist qualified small business owners by offering them sole-source, no-bid government contracts, while gradually positioning them to compete in the general marketplace. *See* 15 U.S.C. § 631; 13 C.F.R. §§ 124.508-09. The program is limited to a nine-year term, after which a participant is deemed to "graduate." 13 C.F.R. § 124.2. As a rule, a privately owned business is eligible for the program if it is majority owned, operated, and controlled by a "socially and economically disadvantaged individual[]." 15 U.S.C. § 637(a)(4). The controlling regulations define "[s]ocially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities."[2] 13 C.F.R. § 124.103(a). The regulations define "[e]conomically disadvantaged individuals" in the following manner:

> . . . socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged.

---

[2] The SBA employs a "rebuttable presumption" that Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea) are socially disadvantaged individuals. *See* 13 C.F.R. § 124.103(b). WALTER DIXON represented to the SBA that he is a qualifying Asian Pacific American—his origins are not at issue herein.

*Id.* at § 124.104(a). To show that he is an economically disadvantaged individual, one "must describe it in a narrative statement, and must submit personal financial information" as evidence of his status. *Id.* at §124.104(b)(1). Further, the individual's net worth must be less than $250,000. *See id.* at § 124.104(c)(2). Once a business has been admitted into the program, the owner's net worth must remain below $750,000 to maintain eligibility. *See id.* The SBA conducts an annual review of each business to enforce these requirements. *See id.* at § 124.112(b). As part of that review, a participant must certify that it continues to meet the program requirements. *See id.* And with these certifications, the business and its owner must submit records to document their financial activity and status. *See id.*

The SBA regulations also clarify the phrase "net worth." *See id.* at §§ 124.104, 124.112. For instance, in determining net worth, the SBA excludes the owner's interest in the business, but not for the individual's total assets. *See id.* It also excludes from the "net worth" calculation the owner's equity in his claimed personal residence, except as to any amounts attributable to "excessive withdrawals from the company." *Id.* For that reason, if the owner's home equity grows, in part, because "excessive withdrawals" allow him to make larger mortgage payments or improvements than he would otherwise make, the excess value will be counted toward his net worth. *See id.* Further, if the business has annual sales in excess of $2 million, the SBA deems withdrawals of more than $300,000[3] to be "excessive." *See id.* The regulations also provide that, if the owner's net worth becomes too great, the SBA has the following options: it can (i) terminate the business's participation in the program; (ii) allow the business to "graduate" from the program early; or (iii) require the business to make financial restitution. *See id.* at § 124.112(d)(2).

---

[3] In 2011 the regulation was amended to allow up to $400,000 in withdrawals.

In addition, once a business has been admitted into the 8(a) Program, SBA regulations require it to "make maximum efforts" to obtain business through the general marketplace. *See id.* at § 124.509(a). To this end, the SBA sets out "target" amounts of non-8(a) "business activity" that the participant must acquire during the last five years of the nine-year program. *See id.* at §§ 124.2, 124.404(a), 124.509(b). If the business does not meet these targets, it will not be allowed to participate in the program unless it rectifies the situation. *See id.* at § 124.509(c). The targets are typically a percentage of the company's yearly revenue that is derived from contracts acquired from non-8(a) sources, as opposed to 8(a) sources. *See id.* at §§ 124.303, 124.509(b). Further, these percentages are expected to increase from year to year so that, when the program ends, the business derives most of its revenue from non-8(a) sources.[4] *See id.* In fact, false certification of compliance with the targets is considered good cause for termination. *See id.* at 124.303(a)(15).

Finally, once a business and its qualifying owner have participated in the 8(a) Program, neither will be eligible to participate again. *See id.* at § 124.108(b). In that regard, the regulations are as follows:

> An individual who uses his or her one-time eligibility to qualify a concern for the 8(a) BD program will be considered a non-disadvantaged individual for ownership or control purposes of another applicant or Participant. The criteria restricting participation by non-disadvantaged individuals will apply to such an individual.

*Id.* For that reason, if a business is admitted into the 8(a) Program, but it is later discovered that the business is controlled by a prior program participant, the new business will be excluded. *See id.*

## SUMMARY OF REQUIRED CERTIFICATIONS

A. <u>Representing SDVOSB Status</u>

---

[4] The non-8(a) business activity targets increase each year during the five-year transition stage—15%, 25%, 35%, 45%, and 55%.

37.     In summary, to lawfully represent SDVOSB status in the CCR, ORCA, and SAM databases, and obtain award of an SDVOSB set-aside or sole source contract, the contractor must be at least 51% directly owned and controlled by an individual who, at the time the representation is made, is considered by the Government to be a Service-Disabled Veteran. Misrepresenting SDVOSB status in the CCR, ORCA, or SAM databases constitutes a false claim under the FCA.

38.     Also in summary, pursuant to the FCA's *presumption of loss* rule, 15 U.S.C. § 632(w)(1), a contractor is liable for, *inter alia*, the total contract amount it was awarded for each contract it received by making false SDVOSB representations.

39.     Any SDVOSB representation made in any Federal electronic database, to include CCR, ORCA, and SAM, for the purpose of being considered for award of a federal contract or subcontract "shall be deemed [an] affirmative, willful, and intentional" violation of the FCA.  15 U.S.C. § 632(w)(2).

40.     The SDVOSB Program relies on trust—in that contractors are allowed to self-represent that they are eligible SDVOSB concerns.  Because contractors are able to self-represent SDVOSB status—rampant fraud exists in the SDVOSB Program.

B.  Representing 8(a) Status

41.     In summary, to gain entry into the 8(a) Program, a small business must certify, *inter alia*, that it is majority-owned, managed, and controlled by an "economically disadvantaged individual."  Thereafter, it must provide as part of its annual review certificates that it continues to be eligible for the Program, and that there have been no changed circumstances in that regard. In addition, it must provide as part of its annual review accurate information about its business

activity targets. Failure in any of these regards renders the participant ineligible for the 8(a) Program, which means that it <u>cannot</u> get no bid, sole source contracts through the SBA.

42.     Also in summary, under the FCA, if the participant falsely certifies 8(a) eligibility, such participant is liable for, *inter alia*, the full value of each contract it was awarded.

## FACTUAL BACKGROUND

43.     On October 6, 2003, THERMCOR was founded by Defendants WALTER DIXON, RONALD DIXON, and WILLIAM BOLEAN.

44.     THERMCOR is a ship repair contractor whose primary business is providing insulation services to Navy and Coast Guard ships.

45.     On October 4, 2007 THERMCOR was granted admission into the SBA's 8(a) minority business development program.

46.     Relator, A1, is also a ship repair contractor.

A.     The Defendants' SDVOSB Fraud

47.     On or about June 15, 2011 THERMCOR bid on Coast Guard contract Sol. No. HSCG80-11-Q-P45MY7, a SDVOSB set-aside ship repair contract.

48.     On August 17, 2011, the Coast Guard informed A1 that it intended to award Sol. No. HSCG80-11-Q-P45MY7 to THERMCOR.

49.     On August 18, 2011, at 4:00 p.m. EST, A1's President Adrian Batlle, called THERMCOR at (757) 622-7881 and spoke with WALTER DIXON directly. Mr. Batlle requested proof of WALTER DIXON's service disability records from the Department of Veterans Affairs.

50.     During the August 18, 2011 phone conversation, WALTER DIXON admitted that he was not a Service Disabled Veteran. *See*, **EXHIBIT 1** (Affidavit of Mr. Adrian Batlle.)

51. WALTER DIXON is not a Service Disabled Veteran and cannot prove that he is.

52. THERMCOR is not directly owned and controlled by a Service Disabled Veteran and is not a valid SDVOSB concern; however, THERMCOR knowingly and fraudulently misrepresented that it was a SDVOSB concern in CCR, ORCA, in order to obtain approval and payment for Sol. No. HSCG80-11-Q-P45MY7.

53. On August 18, 2011, A1 discovered that THERMCOR misrepresented its SDVOSB status in the United States' CCR and ORCA databases. *Id.*

54. On August 18, 2011, A1 also discovered that THERMCOR had been awarded $23,835,783 in United States Federal Government contracts by falsely and fraudulently misrepresenting that THERMCOR was a SDVOSB concern.

55. Upon learning that THERMCOR was not an eligible SDVOSB concern, but was in fact fraudulently misrepresenting SDVOSB status in order to obtain SDVOSB set-aside contracts and preferences, on August 19, 2011 A1 filed a SDVOSB eligibility protest with the SBA for Sol. No. HSCG80-11-Q-P45MY7. *Id.*

56. On September 13, 2011 THERMCOR emailed the SBA and informed the SBA that it was withdrawing its offer for Sol. No. HSCG80-11-Q-P45MY7 in order to avoid the SBA from learning that THERMCOR was fraudulently bidding on SDVOSB set-aside contracts.

57. Because THERMCOR withdrew its offer for Sol. No.: HSCG80-11-Q-P45MY7, THERMCOR was no longer an interested party, and the SBA withdrew the protest. *Id.*

58. On or about October 15, 2012, THERMCOR again knowingly and fraudulently represented it was a SDVOSB concern in CCR and ORCA in order to obtain another ship repair contract.

59.     On December 17, 2012, the Department of Defense ("DOD") awarded THERMCOR a $1,262,635 dollar SDVOSB sole-source ship repair contract, Procurement Instrument Identifier ("PIID") N3220513C3003. THERMCOR knew that it was not eligible to receive the contract—because it was not a valid SDVOSB concern—but knowingly and fraudulently misrepresented to the DOD in CCR and ORCA that it was a SDVOSB concern.

60.     The DOD relied on THERMCOR's false and fraudulent SDVOSB certifications in CCR and ORCA in awarding and paying THERMCOR to perform PIID N3220513C3003.

61.     THERMCOR performed the contract, PIID N3220513C3003, and the DOD paid THERMCOR $1,262,635 dollars for performing the contract.

62.     THERMCOR and all individual Defendants falsely and fraudulently misrepresented THERMCOR's SDVOSB status in order to obtain bid preferences for $30,640,487 dollars in federal government ship repair contracts. A detail lists of these contracts, to include each contract's PIID, set-aside type, award date, and award amount is annexed hereto as **EXHIBIT 2.**

63.     In each contract listed in Ex. 2, THERMCOR and all individual Defendants knowingly and fraudulently represented that THERMCOR was a SDVOSB concern. The Government relied on these representations to give THERMCOR bid preferences—to which it was not eligible to receive. Had the Government known THERMCOR was misrepresenting its SDVOSB status, it would not have awarded THERMCOR any contract listed in Ex. 2 because THERMCOR would have been deemed to have poor moral character.

64.     Per FAR regulations, good moral character is a requirement to being awarded a federal government contract. THERMCOR's SDVOSB fraud demonstrates that it lacks good moral character.

B.  The Defendant's 8(a) Program Fraud

65.     As stated above, in order to remain in the SBA 8(a) Program, THERMCOR and WALTER DIXON were required to annually report their net worth and total assets to the SBA each calendar year beginning in 2007 and continuing to the present date.

66.     Beginning in 2008, the Government began to award THERMCOR millions of dollars in SBA 8(a) contracts. *See* Ex. 2.

67.     In 2008 THERMCOR and all individual Defendants were aware that if THERMCOR and WALTER DIXON made too much money, WALTER DIXON would not be considered economically disadvantaged per the 8(a) regulations.  As previously stated, if the 8(a) participant owner obtains a net worth greater than $750,000 dollars, he is no longer considered economically disadvantaged, and 8(a) eligibility is terminated.

68.     Consequently, THERMCOR and all individual Defendants formed a scheme to enable THERMCOR and WALTER DIXON to fraudulently misrepresent reduced net worth and asset values in their annual 8(a) certifications.

69.     On July 1, 2008, the individual Defendants formed TMLG, LLC ("TMLG").  Annexed hereto as **EXHIBIT 3** is a copy of TMLG's registration with the Virginia Secretary of State.

70.     WILLIAM BOLEAN was appointed as TMLG's registered agent and RONALD DIXON and WILLIAM BOLEAN were provided ownership shares in TMLG. *Id.*

71.     In calendar year 2008 THERMCOR was paid at least $5,311,672 in federal government contracts; in calendar year 2009 THEMCOR was paid at least $8,077,070 in federal government contracts; and in 2010 THERMCOR was paid $6,136,293 in federal government contracts. *See* Ex. 2

72.     In 2011 THERMCOR and all individual Defendants realized that WALTER DIXON was making too much money and his net worth and total assets were too great for him to be considered an economically disadvantaged person per 8(a) regulations. So THERMCOR, TMLG, and all individual Defendants transferred THERMCOR's real property, 2601 Colley Ave Norfolk, Virginia 23517 into TMLG. TMLG then began charging THERMCOR excessive rents to generate phantom losses. Annexed hereto as **EXHIBIT 4** is a copy of TMLG's real estate tax statements.

73.     Transferring THERMCOR's real property into TMLG served two purposes. It allowed THERMCOR's two non-economically disadvantaged founders, RONALD DIXON and WILLIAM BOLEAN, to withdraw higher profits from THERMCOR than their ownership interest allowed by siphoning off rents collected from THERMCOR via TMLG. It also enabled WALTER DIXON and THERMCOR to falsely allege their net worth and assets were lower than if THERMCOR retained the real property interests and did not divest excessive rental payments to TMLG.

74.     In his annual reports to the SBA, WALTER DIXON fraudulently failed to disclose that TMLG was owned and operated by two of THERMCOR's principles and officers, RONALD DIXON and WILLIAM BOLEAN.

75.     Nor did WALTER DIXON report the income and assets that were transferred to RONALD DIXON—as SBA regulations required him to do—because RONALD DIXON is his immediate family member. *See* 13 CFR §§ 124.104(c)(1) and 124.3. Had WALTER DIXON reported this income and these assets to the SBA, he would not have qualified as an economically disadvantaged person and THERMCOR would have been terminated from the 8(a) Program in 2011.

76.     Moreover, THERMCOR, and all individual Defendants fraudulently obtained the $1,262,635 SDVOASB sole source contract, PIID N3220513C3003, in order to misrepresent to the SBA that THERMCOR was meeting its non-8(a) target for calendar years 2012 and 2013. Had THERMCOR failed to fraudulently obtain this contract, it would not have met its non-8(a) target and would have been terminated from the SBA 8(a) Program in 2012.

77.     Additionally on April 18, 2011, WALTER DIXON purchased a luxurious country estate located at 1011 QUARTER HORSE LANE, SUFFOLK, VA 23434. Annexed hereto as **EXHIBIT 5** is a copy of the real estate assessment.

78.     In his annual 8(a) representations to the SBA, WALTER DIXON fraudulently failed to disclose the luxurious country property he purchased at 1011 QUARTER HORSE LANE, SUFFOLK, VA 23434. Annexed hereto as **EXHIBIT 6** are pictures of WALTER DIXON's luxurious country estate in Suffolk, Virginia.

79.     WALTER DIXON never reported his luxurious country estate to the SBA, instead he continues to report 920 Sherry Ave. Virginia Beach, VA 23464 as his primary residence.

80.     In fact, on June 17, 2013, in an effort to conceal his newly acquired luxurious estate, WALTER DIXON represented that 920 Sherry Ave. Virginia Beach, VA 23464 was his place of residence in his campaign contribution to Congressman Villanueva. *See* **EXHBIT 7**.

81.     WALTER DIXON's fully furnished luxurious estate is worth well over 2 million dollars—the property is constantly undergoing improvements to include a massive swimming pool, Jacuzzi, outdoor kitchen, and screened in patio—yet he has the audacity to continue to represent to the SBA that he is an "economically disadvantaged individual" in his annual 8(a) reports.

82.     Nothing could be farther from the truth. WALTER DIXON is an extraordinarily wealthy man, with assets easily exceeding 10 million dollars. Despite his best efforts to conceal his wealth from the SBA, he is hardly economically disadvantaged, and his net worth and total assets greatly exceed the 8(a) limits. What WALTER DIXON is doing is unlawfully plundering the SBA 8(a) sole-source Program—to the detriment of tax payers. The fact that his company, THERMCOR, was paid $30,640,487 in federal contracts in 6 years—in addition to private contracts—makes highly plausible that this man has millions in net worth.

83.     His brother, RONALD DIXON—who as minority owner of THERMCOR makes less than WALTER DIXON—but manages to own millions of dollars in assets, to include, a million dollar home, a million dollar yacht, a show quality GT 500 Shelby Cobra Mustang, a Roush 5XR Mustang GT, numerous Harley Davidson motorcycles, F-150 Platinum series pickup truck, a large trailer to haul his show cars, and a jet ski. *See* **EXHIBIT 8**.

84.     Like WALTER DIXON's homes, RONALD DIXON's home is constantly undergoing luxurious improvements, to include a massive bbq and a newly constructed driveway to tune his show cars. *See* **EXHIBIT 9**. These are hardly the showings of economically disadvantaged people, rather they are evidence of extraordinary largess and extravagance paid for by humble tax payers.

85.     But extraordinary extravagances—in stark contrast to economic need—is the status quo for the Defendants, to include the offices of THERMCOR which rival any million dollar mansion, including, granite counter tops and extravagant wood finishing throughout the building. *See* **EXHIBIT 10**.

86.     Indeed there appears to be no expense too great for the folks at THERMCOR—to include the $100,000+ dollar company "race" car—a 2013 BMW XM6—with 555 horsepower on tap. *See* **EXHIBIT 11**.

**FIRST CAUSE OF ACTION**
**(False Claims Act: Making or Using False Record or Statement)**
**(31 U.S.C. § 3729, et seq.)**
**(Against THERMCOR and all individual Defendants)**

87.     A1 repeats and realleges each allegation in ¶¶ 1 through 86 as if fully set forth herein.

88.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq. as amended, and incorporating all other relevant statutes and regulations.

89.     By virtue of the acts described above, THERMCOR and all individual Defendants falsely and fraudulently misrepresented or conspired to misrepresent, authorize and ratify knowingly presented, conspired, or caused to be presented, false or fraudulent claims and statements to the United States Government for payment and approval in the SDVOSB set-aside.

90.     By virtue of the acts described above, THERMCOR and all individual Defendants knowingly made, used, conspired, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the Federal Government to allow THERMCOR to continue its participation in the SBA's 8(a) business development Program.

91.     Each false statement, certification, or omission by THERMCOR and all individual Defendants was made intentionally and knowingly for the purpose of causing the federal government to make or approve payment on a federal contract. And each statement, certification, or omission was material and relied upon by the Government in making and/or approving a payment.

92.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by THERMCOR and all individual Defendants, paid and continues to pay the claims that would not be paid but for these Defendants' false and fraudulent statements, claims, and omissions.

93.     THERMCOR and all individual Defendants knowingly made, ratified, authorized, used, conspired, and caused to be made or used, false records, statements, and omissions material to false or fraudulent claims for approval and payment by the United States.

94.     By virtue of the false records, statements, claims, and omissions made by all THERMCOR and all individual Defendants, A1, tax payers, the public fisc, and the United States suffered damages and therefore are entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, and attorney's fees and costs.

95.     Relator requests a jury trial on all issues so triable.

**SECOND CAUSE OF ACTION**
**(False Claims Act: Presentation of False Claims)**
**(31 U.S.C. § 3729, et seq.)**
**(Against THERMCOR and all individual Defendants)**

96.     A1 repeats and realleges each allegation in ¶¶ 1 through 86 as if fully set forth herein.

97.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq. as amended, and incorporating all other relevant statutes and regulations.

98.     By virtue of the acts described above, THERMCOR and all individual Defendants falsely and fraudulently misrepresented or conspired to misrepresent, authorize and ratify knowingly presented, conspired, or caused to be presented, false or fraudulent claims and statements to the United States Government for payment and approval in the SDVOSB set-aside.

99.     By virtue of the acts described above, THERMCOR and all individual Defendants knowingly made, used, conspired, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the Federal Government to allow THERMCOR to continue its participation in the SBA's 8(a) business development Program.

100.     Each false statement, certification, or omission by THERMCOR and all individual Defendants was made intentionally and knowingly for the purpose of causing the federal government to make or approve payment on a federal contract. And each statement, certification, or omission was material and relied upon by the Government in making and/or approving a payment.

101.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by THERMCOR and all individual Defendants, paid and continues to pay the claims that would not be paid but for these Defendants' false and fraudulent statements, claims, and omissions.

102.     THERMCOR and all individual Defendants knowingly made, ratified, authorized, used, conspired, and caused to be made or used, false records, statements, and omissions material to false or fraudulent claims for approval and payment by the United States.

103.     By virtue of the false records, statements, claims, and omissions made by all THERMCOR and all individual Defendants, A1, tax payers, the public fisc, and the United States suffered damages and therefore are entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, and attorney's fees and costs.

104.     Relator requests a jury trial on all issues so triable.

## THIRD CAUSE OF ACTION
### (False Claims Act: Conspiracy to Make or Use False Record
### or Statement or Presentation of False Claims)
### (31 U.S.C. § 3729, et seq.)
### (Against THERMCOR, TLMG, and all Individual Defendants)

105.     A1 repeats and realleges each allegation in ¶¶ 1 through 86 as if fully set forth herein.

106.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq. as amended, and incorporating all other relevant statutes and regulations.

107.     By virtue of the acts described above, THERMCOR, TLMG, and all individual Defendants conspired to, and did in fact, misrepresent, authorize and ratify knowingly presented, conspired, or caused to be presented, false or fraudulent claims and statements to the United States Government for payment and approval in the SDVOSB set-aside.

108.     By virtue of the acts described above, THERMCOR, TLMG, and all individual Defendants knowingly made, used, conspired, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to induce the Federal Government to allow THERMCOR to continue its participation in the SBA's 8(a) business development Program.

109.     Each conspiracy to make a false statement, certification, or omission by THERMCOR, TLMG, and all individual Defendants was made intentionally and knowingly for the purpose of causing the federal government to make or approve payment on a federal contract. And each statement, certification, or omission was material and relied upon by the Government in making and/or approving a payment.

110.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by THERMCOR, TLMG, and all individual Defendants' conspiracy,

paid and continues to pay the claims that would not be paid but for these Defendants' false and fraudulent statements, claims, and omissions.

111.    THERMCOR, TLMG, and all individual Defendants knowingly made, ratified, authorized, used, conspired, and caused to be made or used, false records, statements, and omissions material to false or fraudulent claims for approval and payment by the United States.

112.    By virtue of the conspiracy to make false records, statements, claims, and omissions made by THERMCOR, TLMG, and all individual Defendants, A1, tax payers, the public fisc, and the United States suffered damages and therefore are entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation, and attorney's fees and costs.

113.    Relator requests a jury trial on all issues so triable.

**WHEREFORE**, Relator A1 demands judgment against all Defendants as follows:

    A.  On Plaintiff's Count One, making or using false records, statements, or omissions in violation of the False Claims Act, judgment against THERMCOR and all individual Defendants all Defendants, for treble damages, for the maximum number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each violation, permanent disbarment from contracting with the Federal Government, attorney's fees, costs and interest, plus such other relief as the jury deems appropriate and just;

    B.  On Plaintiff's Count Two, presentation of a false claim in violation of the False Claims Act, judgment against THERMCOR and all individual Defendants, for treble its damage, for the maximum number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each

violation, permanent disbarment from contracting with the Federal Government, attorney's fees, costs, and interest, plus such other relief as the jury deems appropriate and just;

C. On Plaintiff's Count Three, Conspiracy to make or use false record or statements, or presentation of a false claim in violation of the False Claims Act against THERMCOR, TLMG, and all individual Defendants, for treble its damage, for the maximum number of civil penalties allowable by law, in an amount as the Court may determine between $5,500 and $11,000 for each violation, permanent disbarment from contracting with the Federal Government, attorney's fees, costs, and interest, plus such other relief as the jury deems appropriate and just;

D. That Relator A1 recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

E. That Relator A1 be awarded all reasonable attorney's fees and costs in bringing this action;

F. That in the event the United States Government intervenes and proceeds with this action, Relator A1 be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

G. That in the event the United States Government does not intervene and proceed with this action, Relator A1 be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

H. That Relator A1 be awarded prejudgment interest;

I. And for all other and further relief as the Court may deem just and equitable;

J. For pre-judgment interest, post-judgment interest, attorney's fees and costs, as the jury deems appropriate and just.

K. Plaintiffs request a jury trial on all issues so triable.


Dated: May 20, 2014                                    Respectfully submitted,


_DERRICK STORMS_

STORMS AND ASSOCIATES, P.A.
Bar No.: 0079090
143 13th Street, Ste. 4F
Brooklyn, New York 11215
TEL: (917) 635-9675


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above **First Amended Complaint** was filed **Under Seal** pursuant to the False Claims Act and was served on the U.S. attorney of record by ECF.


By: _Derrick Storms_