| | |
|---|---|
| A1 PROCUREMENT, LLC, | ) |
| | ) |
| Relator, | ) |
| | ) |
| v. | )      Case No.: 2:15-cv-15 |
| | ) |
| THERMCOR, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

# REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Joint Motion to Revoke the *Pro Hac Vice* Admission of Derrick Storms, or, in the Alternative, for Storms' Disqualification ("Motion to Revoke"). ECF No. 83. This matter was referred to the undersigned United States Magistrate Judge pursuant to a Referral Order from the Chief United States District Judge. ECF No. 93; *see also* 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); E.D. Va. Local Civ. R. 72. For the following reasons, the undersigned **RECOMMENDS** that the Defendants' Motion to Revoke be **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The nature of this case is a *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3730(b). The Relator[1] claims that the Defendants made false statements and claims regarding the Defendants' "Service-Disabled Veteran-Owned Small Business status[2] ("SDVOSB"), and

---

[1] This Court will also refer to Relator as "A1 Procurement, LLC" and "A1."
[2] "The Veterans Benefits Act of 2003, Pub. L. No. 108-183, 117 Stat. 2651, established a Procurement program for SDVOSB concerns. The program sets aside and sole source Federal contracts to SDVOSB concerns, and gives preferences to SDVOSB concerns in non-SDVOSB contracts. To be eligible for SDVOSB set-aside or sole source

Small Business Administration ("SBA") 8(a) status,[3] in order to bid on, obtain award, and payment for approximately $30 million dollars in United States federal government contracts." ECF No. 25 ¶ 1.

On November 3, 2011, the Relator filed a *qui tam* Complaint ("Original Complaint") asserting violations of the FCA against the Defendants in the United States District Court for the Southern District of Florida. ECF No. 1. The Original Complaint was limited to the allegation that the Defendants misrepresented their SDVOSB status in order to obtain federal contracts (the "SDVOSB claim"). *Id.* On December 3, 2013, after the Government declined to intervene in this action, the District Court for the Southern District of Florida ordered the case unsealed and directed the Relator to serve all pleadings and motions on the Defendants. ECF No. 17. Relator filed its First Amended Complaint ("Amended Complaint") on May 21, 2014 alleging new facts and allegations regarding the Complaint. ECF No. 25 and attachs. 1-11; ECF No. 66 attach. 16 at 2. Specifically, the Amended Complaint added the claim that the Defendants misrepresented their eligibility to participate in the SBA's 8(a) program (the "SBA 8(a) program claim"). ECF No. 25. Defendants filed their Answer, and asserted the affirmative defense, *inter alia,* that Relator's SDVOSB claim is barred by the public disclosure bar.[4] ECF No. 64. Shortly thereafter, the case was transferred to the Eastern District of Virginia. ECF No. 57.

On July 1, 2015, the Defendants filed their Motion to Revoke. ECF No. 83. In their Brief in Support of the Motion to Revoke, the Defendants argued that Derrick R. Storms ("Mr.

---

contracts, or to register on a Federal website as an SDVOSB concern for procurement preferences in non-SDVOSB set-aside contracts – a business must be at least 51% directly owned and controlled by an individual who, at the time the representation is made, is considered by the Government to be a Service-Disabled Veteran." ECF No. 25 ¶ 26; 15 U.S.C. § 657f (2003).

[3] "The SBA'S 8(a) Minority Sole-source Program is intended to assist qualified small business owners by offering them sole-source, no-bid government contracts, while gradually positioning them to compete in the general marketplace." ECF No. 25 ¶ 36.

[4] The public disclosure bar is essentially a FCA "checkpoint" that prevents an individual from bringing a FCA claim based on information that was publicly disclosed, such as in an administrative hearing or newspaper, when the individual is not the original source of that public disclosure. 31 U.S.C. § 3730(4).

2

Storms"), counsel for the Relator and a member of the New York and Florida bars, "committed a fraud upon this Court" by failing to disclose on his *pro hac vice* application for admission to the Eastern District of Virginia Bar that he had been reprimanded by federal courts in New York and Florida. ECF No. 84 at 5, 7. The Defendants contended that Mr. Storms' certification that he had "not been reprimanded in any court nor has there been any action in any court pertaining to [his] conduct or fitness as a member of the bar" was untrue and therefore a violation of the Virginia Rules of Professional Conduct ("Prof'l Rules"). *Id.*; ECF No. 61 attach. 1. The Defendants contended that orders entered by courts in the Eastern District of New York and the Southern District of Florida chastising Mr. Storms constituted "reprimand[s] in any court" or "action[s] in any court pertaining to [his] conduct or fitness as a member of the bar." *Id.*

Relator filed a Memorandum of Law in Opposition to the Defendants' Motion to Revoke Pro Hac Vice Application ("Relator's Response"), on July 15, 2015. ECF No. 86. In Relator's Response, Mr. Storms argued that he had never been "reprimanded" in the Southern District of Florida or in the Eastern District of New York because the local rules of those districts only categorize formal disciplinary proceedings as reprimands, and he personally was never the subject of a formal disciplinary proceeding. *Id.* at 1-3.

On July 17, 2015, the Defendants requested a hearing on the pending Motion to Revoke. ECF No. 89. Defendants then filed a rebuttal, ("Rebuttal Brief") on July 23, 2015. In their Rebuttal Brief, the Defendants argued that Mr. Storms' reliance on the local rules of other districts to define what constitutes a reprimand was inapposite since it was incumbent on him to cite to persuasive authority from this district to show that his conduct in the other districts would not be considered a "reprimand" in the Eastern District of Virginia. ECF No. 94 at 5-8.

The Motion to Revoke was then referred to the undersigned by Chief United States District Judge Smith. ECF No. 93. It was subsequently brought to the Court's attention that Mr. Storms, who practices under the firm name "Storms and Associates, P.A.," may be a sole practitioner. Consequently, on August 3, 2015, the Court issued an Order directing the matter be set for hearing. ECF No. 97. In that Order, the Court notified both parties regarding the upcoming hearing: "In addition to the arguments raised in the briefs, counsel for Plaintiff [sic] should be prepared to address whether Plaintiff's counsel's firm name of 'Storms and Associates, P.A.' comports with Virginia Rules of Professional Conduct 7.1[5] and 7.5.[6]" *Id.* Hence, Mr. Storms was provided notice that his compliance with the Virginia Rules of Professional Conduct regarding this issue would be addressed by the Court at the hearing on the Motion to Revoke.

Shortly before the hearing, the Defendants submitted a "Notice of Information" informing the Court that Mr. Storms' address of record with the Court is not an office but rather Mr. Storms' brother's home. ECF No. 107. The Defendants stated that they became aware of this information when attempting to serve Mr. Storms a deposition subpoena. *Id.* attach 1.

The Court then held the requested hearing on August 28, 2015 before the undersigned (the "hearing").[7] ECF No. 108. At that hearing it was disclosed, *inter alia,* that Mr. Storms was the Chief Executive Officer ("CEO"), and sole officer, employee, and shareholder of A1 Procurement, LLC. Hr'g Tr. at 96. The parties also discussed the Defendants' attempt to depose Mr. Storms. *Id.* at 89-103. On September 3, 2015, the Court ordered the Defendants to submit a post-hearing brief addressing what effect their attempt to depose Mr. Storms had on the Defendants' Motion to Revoke, including whether Mr. Storms would be considered a necessary

---

[5] "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services." Va. Rules of Prof'l Conduct r. 7.1 (Va. St. Bar 2009).
[6] "A lawyer shall not use a name, firm name, letterhead, or other professional designation that violates Rule 7.1" Va. Rules of Prof'l Conduct r. 7.5 (Va. St. Bar 2009).
[7] On September 8, 2015, the clerk's office posted the hearing transcript (hereinafter "Hr'g Tr."). ECF No. 112.

witness under Prof'l Rule 3.7.[8] ECF No. 111. Relator was also ordered to respond to the Defendants' submission. *Id.* On September 10, 2015, in response to the Court's September 3, 2015 Order, the Defendants submitted a Supplemental Brief in support of their Motion to Revoke ("Supplemental Brief"). ECF No. 113. In their Supplemental Brief, the Defendants argued that Mr. Storms' present situation implicates both Prof'l Rule 3.7(a) and 3.7(b), claiming that he was a necessary witness on their affirmative defense of the public disclosure bar.[9] *Id.* at 8. Under Prof'l Rule 3.7(a), the Defendants claimed Mr. Storms' role as a necessary witness was apparent from the onset of the case because his "testimony would be non-tangential and . . . unobtainable elsewhere." ECF No. 113 at 9. As for Prof'l Rule 3.7(b), the Defendants alternatively asserted that it was obvious at least from the time they filed their Answer that Mr. Storms would be a necessary, relevant, and prejudicial witness because his control of the Relator directly related to the Defendants' affirmative defense to the SDVOSB claim averring that A1 Procurement, LLC was not an original source. *Id.* at 12-13. Specifically, the Defendants alleged that Mr. Storms is the only person with reliable information regarding the SBA protest,[10] the event which is alleged to be the public disclosure. *Id.*

---

[8] **Lawyer As Witness.**
(a) A lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
(b) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client.
(c) A lawyer may act as advocate in an adversarial proceeding in which another lawyer in the lawyer's firm is likely to be called as witness unless precluded from doing so by Rule 1.7 or 1.9.
Va. Rules of Prof'l Conduct r. 3.7 (Va. St. Bar 2009).
[9] As discussed in ECF No. 116 III.C.5, Defendants contended that A1 Procurement, LLC is not the original source of a public disclosure made by A1 Procurement, JVS, when the latter entity lodged an SBA protest regarding the Defendants' SDVOSB status.
[10] *See* ECF No. 116 III.A.

5

Relator filed its response on September 17, 2015 ("Response to Supplemental Brief"). ECF No. 114. In his response, Mr. Storms argued that he is not a necessary witness because "the Defendants' false statements . . . will be proven by Relator through documentary evidence." *Id.* at 3. Further, Mr. Storms stated that he does not need to testify in his capacity as owner and CEO of A1 because Relator has a designated agent who will testify to the FCA allegations. *Id.* Mr. Storms also asserted that his testimony as a witness is not relevant to the Defendants' defenses because, in his view, there is no issue regarding the "original source," . . . no public disclosures occurred in this action because nothing was disclosed to the 'public at large[,]'" and, if he were to testify, his testimony would be cumulative to or duplicative of the documentary evidence presented at trial by Relator. *Id.* at 7 n.4, 8. Lastly, he argued that his testimony would not be prejudicial to A1 because it "would only corroborate Relator's documentary evidence." *Id.* at 8.

This matter is now ripe for disposition and, upon careful and thorough review, the undersigned **RECOMMENDS** that Defendants' Motion to Revoke be **GRANTED**.

## II. STANDARD OF REVIEW

There is no constitutional protection for *chosen* counsel in a civil case. *See Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 24 (1st Cir. 2005); *Parnell v. Supreme Court of Appeals of W. Virginia*, 110 F.3d 1077, 1081 (4th Cir. 1997) (noting that there is no "cognizable property right within the terms of the Fourteenth Amendment"). Further, if said chosen counsel is also a nonresident as well, *i.e.* not a member of the state bar in the state in which he seeks to practice, then counsel must obtain *pro hac vice* admission. *Goldfarb v. Supreme Court of Virginia*, 766 F.2d 859, 861 (4th Cir. 1985) (stating that a nonresident attorney can either take

the Virginia Bar Examination or could appear *pro hac vice*); *see generally Friedman v. Supreme Court of Virginia*, 822 F.2d 423 (4th Cir. 1987) *aff'd*, 487 U.S. 59 (1988) (discussing the effect of Virginia's Bar Examination rules on nonresident attorneys).

The ability to appear *pro hac vice* is a privilege, not a right, "the granting of which is a matter of grace resting in the sound discretion of the presiding judge." *Thomas v. Cassidy*, 249 F.2d 91, 92 (4th Cir. 1957). Consequently, "the decision on whether to grant *pro hac vice* status to an out-of-state lawyer is purely discretionary." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 277 n.2 (1985) (citing *Leis v. Flynt*, 439 U.S. 438, 442 (1979) (*per curiam*)); *Ginsburg v. Kovrak*, 392 Pa. 143, 139 A.2d 889, 892 (1958) ("The practice of law is not open to all and sundry, nor is it an inherent or vested right. It is a personal privilege subject to exacting tests as to moral character and mental grasp of legal principles.").

Once admitted, "*pro hac vice* attorneys are held to the same professional responsibilities and ethical standards as regular counsel, [and] *pro hac vice* attorneys should not be disqualified 'under standards and procedures any different or more stringent than those imposed upon regular members of the district court bar." *Belue v. Leventhal*, 640 F.3d 567, 576-77 (4th Cir. 2011) (citing *Cole v. U.S. Dist. Ct. for the Dist. of Idaho*, 366 F.3d 813, 821 (9th Cir.2004)). Further, "[r]evocation of an attorney's *pro hac vice* admission is a harsh sanction. As a result, it should be exercised sparingly and only in particularly egregious cases." *In re Davis*, No. CA 11-07525-DD, 2012 WL 3782548, at *1 (Bankr. D.S.C. Aug. 30, 2012). Not only does it remove a granted privilege, but it harms an attorney's reputation. *Id.* One's choice of counsel should be respected unless the chosen counsel would create unreasonable delay, burden the court, serve incompetently, or violate court and ethical rules. *See United States v. Collins*, 920 F.2d 619, 626 (10th Cir. 1990). The courts are then left to delve into a balancing act whereby they attempt to

respect clients' chosen counsel and maintain the professional responsibility and "the public's confidence in the integrity of the judicial process and the orderly administration of justice." *Id.* Therefore, the standard to revoke the privilege is high. The court must find specific grounds of misconduct and afford the attorney due process notice and an opportunity to be heard before revocation.

A. Articulating Specific Grounds

Generally, there is no set standard for approving or denying an attorney's *pro hac vice* admission. It is up to each individual court to set its own standard. In *Leis*, the Supreme Court expressly stated that there is no basis for the argument that "the interest in appearing *pro hac vice* has its source in federal law." 439 U.S. at 442-43 (1979). Instead, the Supreme Court adopted a case-by-case basis for determining *pro hac vice* status, leaving the federal courts with discretion in admitting the attorneys who will practice before them. *Id.* at 443 (noting that the states set the standard: "The States prescribe the qualifications for admission to practice and the standards of professional conduct. They also are responsible for the discipline of lawyers."); *Thoma v. A.H. Robins Co.*, 100 F.R.D. 344, 348 (D.N.J. 1983) ("It is well-settled that courts have wide discretion in determining the admission of out-of-state attorneys *pro hac vice*."). However, simply because one is admitted to and in good standing with a state bar association does not guarantee *pro hac vice* status. *See Flynt*, 439 U.S. at 443; *Schlumberger Technologies, Inc. v. Wiley*, 113 F.3d 1553, 1559 (11th Cir. 1997) (noting that admittance in a state bar creates a presumption of good moral character but that presumption can be rebutted). Once admitted, the court may revoke an attorney's status so long as the court articulates specific grounds to the attorney regarding the possibility of revocation prior to revoking his status. *See Collins*, 920

F.2d at 626 (noting that to revoke, the court "must articulate reasonable grounds for denying *pro hac vice* admission").

Specific grounds for revocation can include unprofessional conduct, violation of the local rules, and a wide variety of ethics violations. Some courts have revoked or denied *pro hac vice* admission based on uncivil behavior or abusive language by an attorney. *See Thomas*, 249 F.2d at 92 (affirming the denial of *pro hac vice* admission "on the ground that [the attorney] had been guilty of unlawyerlike conduct in connection with the case and was being prosecuted by his sister as plaintiff"); *Kohlmayer*, 124 F. Supp. 2d at 883 (considering past misconduct and denying admittance because the attorney "had been warned by numerous judges" to discontinue his uncivilized behavior and he "blatantly failed to heed these warnings"); *Kampitch v. Lach*, 405 F. Supp. 2d 210, 217 (D.R.I. 2005) (denying admission based on attorneys' past misconduct where he was "derelict" in dealing with opposing counsel, made false statements on his admission form, and failed to pay a court sanction imposed by another court); *Metro E. Black Contractors Org., Inc. v. Illinois Dep't of Transp.*, No. CIV. 11-1041-GPM, 2011 WL 6303241, at *2 (S.D. Ill. Dec. 16, 2011) ("[I]t is appropriate to withhold the privilege of appearing [*pro hac vice*] from attorneys who have engaged in unprofessional conduct."). Others have denied admittance based on an attorney's impact on judicial economy. *See Thoma*, 100 F.R.D. at 348 (denying admittance "where a party's out-of-state counsel has continually thwarted the progress of the litigation"). Further, when there are conflicts of interest or clear-cut violations of the rules, denial or revocation of *pro hac vice* admission is also appropriate. *See Panzardi-Alvarez v. United States*, 879 F.2d 975, 981 (1st Cir. 1989) (denying admission based on a joint representation scheme in violation of the rules of ethics); *Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir.1975) (denying admission because of a conflict of interest); *cf. First Interstate Bank of*

*Denver, N.A., v. Estates P'ship*, 117 F.R.D. 683, 685 (D. Colo. 1987) (affirming a Magistrate Judge's finding to deny *pro hac vice* status because the attorney intentionally omitted his convictions for selling securities without a permit and his suspension from the California state bar on his *pro hac vice* application). *But see In re Dreier*, 258 F.2d 68, 69 (3d Cir. 1958) (admitting an attorney who had criminal convictions but was later reinstated to the bar and showed evidence of "subsequent rehabilitation and present good moral character"). This Court finds that even if there is not one bold ground to revoke an attorney's *pro hac vice* admission, the Court has the discretion to revoke an attorney's *pro hac vice* status based on the combined effect of an attorney's misconduct and disregard for the Local Rules, so long as the attorney is provided due process. *See Belue v. Aegon USA, Inc.*, No. C/A 7:08-CV-3830-GRA, 2010 WL 680340, at *4 (D.S.C. Feb. 23, 2010) ("The Attorneys also fail to understand that no single violation or no single act of bad conduct prompted the district court to revoke the Attorneys' *pro hac vice* status, but as outlined in the Revocation Order, it was the combined effect of the Attorneys' improper conduct and disregard for the Local Rules.").

B. Due Process

The Court has discretion to revoke an attorney's *pro hac vice* privilege so long as due process requirements are followed: "Discretion must therefore play a role, so long as the court satisfies the minimal requirements of an individualized notice of the basis for revocation and a meaningful opportunity to respond." *Belue*, 640 F.3d at 577. These requirements are well known throughout all circuits and clearly include in each some form of notice to the attorney of the specific grounds for the potential revocation and an opportunity to be heard. *See id.* ("[C]ourts are generally in agreement that *pro hac vice* attorneys must receive notice of the specific grounds

for revocation and a meaningful opportunity to respond."); *Johnson v. Trueblood*, 629 F.2d 302, 303 (3d Cir. 1980) ("[W]e believe that some type of notice and an opportunity to respond are necessary when a district court seeks to revoke an attorney's *pro hac vice* status."); *see also Collins*, 920 F.2d at 626 (noting that a full-scale hearing is not always necessary to revoke *pro hac vice* admission but counsel must at least be provided with notice and an opportunity to respond); *Martens v. Thomann,* 273 F.3d 159, 175 (2d Cir. 2001).

The notice must include the specific grounds for the Court's inquiry into possible revocation. The Fourth Circuit in *Belue* added that requiring anything beyond notice and a meaningful opportunity to be heard would "erode the trial court's authority over those who appear before it." 640 F.3d at 577. In *Belue*, the Fourth Circuit found the district court did not provide basic due process because the notice given to the attorneys regarding the possible revocation did not provide an appropriate list of reasons for the court's consideration. *Id.* at 578.

> The closest court came to providing a basis for its actions was its sweeping expression of frustration at counsel for "los[ing] the case and attack [ing] the judge." Even in the notice for the July 27 hearing, the court provided no indication of the specific behavior that would be discussed. And at no point did the judge ever mention that the local rules violations might have anything to do with his decision.

*Id.* As for an opportunity to be heard, the district court in *Belue* had not permitted the attorneys to explain their conduct or involvement in the case. *Id.* "[T]he net effect of the procedural flaws was to deny the attorneys any opportunity to present a meaningful response to the court's concerns." *Id.* at 579. In sum, to revoke an attorney's *pro hac vice* admission, due process requires that the attorney have notice of the specific grounds for the potential revocation and an opportunity to address those specific grounds.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The undersigned makes the following findings of fact and conclusions of law with respect to those grounds for revocation for which Mr. Storms was provided with notice and a meaningful opportunity to respond.

### A. Mr. Storms' Failure to Report "Reprimands" from Courts in the Eastern District of New York and the Southern District of Florida Does Not Constitute Misconduct. Nevertheless, the Incidents Giving Rise to These "Reprimands" are Consistent with Misbehavior Demonstrated in this Court.

In the *pro hac vice* application, a foreign (or nonresident) attorney must certify that he has "not been reprimanded in any court nor has there been any action in any court pertaining to [his] conduct or fitness as a member of the bar." E.D. Va. Appl. to Qualify as a Foreign Att'y Under the Local Civ. Rule 83.1(D) and Local Crim. Rule 57.4 (*a/k/a* "Pro Hac Vice Application"), *available at* http://www.vaed.uscourts.gov/formsandfees/attorney.htm. The application also requires that foreign attorneys certify that they have read the Local Rules of this Court, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence. *Id.* In addition, the title of the Pro Hac Vice Application refers to Local Civil Rule 83.1(D). *Id.*

Mr. Storms submitted a Personal Statement along with his application to appear *pro hac vice* in the Eastern District of Virginia on January 20, 2015, after the case was transferred from the Southern District of Florida. ECF No. 61 attach. 1. By signing his Personal Statement, Mr. Storms certified that he had not been reprimanded in any court nor had there been any action in any court pertaining to his conduct or fitness as a member of the bar. *Id.* He also certified that he read the Local Rules of this Court. *Id.* Additionally, local counsel, Eric Cox ("Mr. Cox"), included in his Motion to Admit *Pro Hac Vice* that "Mr. Storms has never been the subject of a

disciplinary action by the bar or courts of the State of New York, or any other state or federal court." ECF No. 61 at 2.

The Defendants asserted in their Brief in Support of the Motion to Revoke that Mr. Storms "committed fraud upon this Court" by failing to report misconduct in violation of Prof'l Rule 8.4(c), ECF No. 84 at 1-2, which states: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation which reflects adversely on the lawyer's fitness to practice law." Va. Rules of Prof'l Conduct r. 3.7(a)(1) (Va. St. Bar 2009). The Defendants pointed to Prof'l Rules 3.3(d)[11] and 8.3(a),[12] stating that, as part of their duty as lawyers and their duty to the Court, they were required to advise the Court of Mr. Storms' purported "fraud upon the court." ECF No. 84 at 2. Moreover, they contended, such conduct warranted referral for investigation and, in essence, the revocation of Mr. Storms' *pro hac vice* status. *Id.* Specifically, the Defendants asserted that Mr. Storms certified that he has "not been reprimanded in any court nor has there been any action in any court pertaining to [his] conduct," when in fact, the Defendants assert that he was reprimanded twice. ECF No. 84 at 3; ECF No. 63. In support of their argument, the Defendants cited to *United States v. Blair*, where the Fourth Circuit stated that an attorney fraudulently obtained *pro hac vice* admission in the Eastern District of Virginia by fraudulently certifying that he had never been reprimanded by any court or subject to any disciplinary action by any bar association when, as it turned out, "not only had [the attorney] been previously reprimanded, but he had his [law] license suspended for a

---

[11] "A lawyer who receives information clearly establishing that a person other than a client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal." Va. Rules of Prof'l Conduct r. 3.3(d) (Va. St. Bar 2009).

[12] "A lawyer having reliable information that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness to practice law shall inform the appropriate professional authority." Va. Rules of Prof'l Conduct r. 8.3(a) (Va. St. Bar 2009).

definite period by the West Virginia Supreme Court of Appeals for witness tampering." 661 F.3d 755, 763, 772 n.3 (4th Cir. 2011); ECF No. 84 at 3.

Relying on *Blair*, the Defendants argued that Mr. Storms was reprimanded twice and failed to disclose each instance to the Court when he applied for *pro hac vice* admission. ECF No. 84 at 3-4. First, the Defendants cited to *Storms v. United States Dep't Veteran Affairs*, a case that alludes to a protective order issued against Mr. Storms (the "Protective Order"). No. 13-CV-0811 MKB, 2014 WL 3547016 (E.D.N.Y. July 16, 2014).[13] The Protective Order, issued March 29, 2013, stated in part: "Plaintiff's counsel, [Mr. Storms,] is prohibited from making threatening or abusive statements to any employees of the Department of Veteran Affairs (the "VA"). Plaintiff's counsel is directed that any written or oral communications with the VA concerning this action must be directed at defense counsel." Ct. Order Granting Motion for Protective Order, No. 13-cv-811 (E.D. N.Y. March 29, 2013). That case involved the Veteran Affairs' VIP database, which permits veteran-owned and controlled businesses to bid on certain government contracts. *Id.* at *1. Mr. Storms is a service-disabled veteran and A1's Chief Executive Officer ("CEO") and, at the time, was 51% majority owner. *Id.* Due to some dispute between the Center for Veterans Enterprise's Deputy Director and Mr. Storms, A1 was removed from the Veteran Affairs' VIP database because his other obligations affected his ability to "control" A1. *Id.* Due to this "disbarment" from the database, Mr. Storms was unable to submit bids on government contracts and the Protective Order prohibited him from submitting electronic invoices to the Veteran Affairs. Joint Mot. to Amend/Correct/Supplement Protective Order, ECF No. 61; 2014 WL 3547016, at *4 ("Defendants do not object to the motion insofar as it seeks to modify the protective order to allow Plaintiffs to submit invoices directly and electronically to the VA."). The Protective Order was later modified to permit Mr. Storms and A1 to

---

[13] Notably, in that case Mr. Storms was both the plaintiff and plaintiff's counsel.

communicate directly with the Veteran Affairs. Ct. Order Granting Joint Mot. to Amend/Correct/Supplement Protective Order, No. 13-cv-811 (E.D. N.Y. March 29, 2013).

Second, the Defendants asserted that the United States District Court for the Southern District of Florida reprimanded Mr. Storms for repeatedly failing to follow local rules and for "contumacious" conduct in ignoring court rules. ECF No. 84 at 4-5 (citing *A1 Procurement, LLC v. Hendry Corp.*, No. 11-23582-CIV, 2012 WL 6214546, at *3 (S.D. Fla. Dec. 13, 2012) (quoting *Rex v. Monaco Coach*, 155 F. App'x 485, 486 (11th Cir.2005))). The District Court for the Southern District of Florida further stated that it "repeatedly reminded Relator that it must comply with the Local Rules. . . . [Relator] failed to certify that it had conferred or made reasonable efforts to confer with Defendants as required by Local Rule . . . [and] Relator has contumaciously sat idle and silent." ECF No. 84 at 4-5 (citing 2012 WL 6214546, at *3). In conclusion, the Defendants asserted that Mr. Storms' failure to disclose these two unreported "reprimands"—the Eastern District of New York's Protective Order and the Southern District of Florida's written order regarding Mr. Storms' failure to comply with local rules—constitutes fraud upon this Court. ECF No. 84 at 15.

In Relator's Response to the Motion to Revoke, Mr. Storms cited to the Local Rules for the Southern District of Florida and the Local Rules for the Eastern District of New York to define "reprimand" and argued that his conduct did not constitute such within those jurisdictions. ECF No. 86. Mr. Storms' argued that "he has never been the subject of a reprimand" and therefore did not need to attest to the two aforementioned incidents on his *pro hac vice* application. *Id.* at 3. Specifically, he argued that the Southern District of Florida Rules provide procedures for issuing a reprimand, which require the Court to refer the matter to the Grievance Committee for investigation, and if probable cause exists for disciplinary action, the court will

then issue an order requiring the attorney to show cause why he should not be disciplined. *Id.* at 1-2. He contended that no investigatory process happened. *Id.* He then pointed to the Local Rules for the Eastern District of New York where the Protective Order arose. *Id.* at 2; *see also* Ct. Order Granting Motion for Protective Order, No. 13-cv-811 (E.D. N.Y. March 29, 2013). Mr. Storms similarly argued that New York provides specified disciplinary procedures for issuing reprimands, which also require action by the Committee on Grievances as well as notice and an opportunity to be heard, but again, that process did not occur. ECF No. 86 at 2-3. Mr. Storms thereby concluded that because he was never subject to any form of investigation, Grievance Committee inquiry, or disciplinary action by any bar, he was never "reprimanded." *Id.*; *see also* Hr'g Tr. at 25 (during the hearing Mr. Storms argued to the Court that the Eastern District of New York's local rules and the Southern District of Florida's local rules "actually define what a reprimand is").

There is no bright-line definition as to what constitutes a "reprimand" in the context of reporting on one's *pro hac vice* application to the Eastern District of Virginia Bar. While Mr. Storms' conduct in New York and Florida may have reflected poorly on his fitness to practice law, nonetheless, this Court finds that his chastisement by those Courts likely did not require him to report those instances on his *pro hac vice* application. The Local Civil Rule 83.1(D)(2) states:

> All practitioners admitted before this Court for the purpose of participating in a particular proceeding pro hac vice shall be subject to the Local Rules of the United States District Court for the Eastern District of Virginia and the Federal Rules of Disciplinary Enforcement . . . [and] shall complete a written application certifying that they have read the Local Rules . . . .

Local Rules for the U.S. Dist. Ct., E.D. Va. 83.1(D) (January 9, 2015). Appendix B to the Local Rules includes the Federal Rules of Disciplinary Enforcement ("Fed. R. Disciplinary Enf't"). *Id.* at appx. B. The Fed. R. Disciplinary Enf't II provides the procedures for an attorney to follow if

another court disciplined the attorney. *Id.* at appx. B, Rule II. The language in the application itself and the Local Rules is clear and simple. After reading the Local Rules, a nonresident attorney would know that "[t]he ethical standards relating to the practice of law in civil cases in this Court shall be Section II of Part Six of the Rules of the Virginia Supreme Court. . . ." *Id.* at 83.1(I). Section II of Part Six of the Rules of the Virginia Supreme Court are the Virginia Rules of Professional Conduct. R. Sup. Ct. Va., Pt. 6 § II.

Since the Local Rules themselves do not specify what instances or conduct an attorney must report on his *pro hac vice* application, the Court does not have a bright-line rule directing it to regard or disregard certain facts as warranting revocation *per se*. Courts and individuals may perceive what constitutes a reprimand differently. The Rules of the Supreme Court of Virginia define a "private reprimand" as "a form of non-public discipline that declares privately the conduct of the Respondent improper but does not limit the Respondent's right to practice law." R. Sup. Ct. Va., *Procedure for Disciplining, Suspending and Disbarring Attorneys*, Pt. 6, § IV, Para. 13 C(6). Further, a "public reprimand" is defined as "a form of public discipline that declares publicly the conduct of the Respondent improper, but does not limit the respondent's right to practice law." *Id.* Black's Law Dictionary takes a similar approach, defining a general reprimand as well as differentiating between private and public reprimands. *See Reprimand*, Black's Law Dictionary (10th ed. 2014) (defining Reprimand: "In professional legal responsibility, a form of disciplinary action that is imposed after trial or formal charges and declares the lawyer's conduct to be improper but does not limit his or her right to practice law; a mild form of lawyer discipline that does not restrict the lawyer's ability to practice law.").[14]

---

[14] Further, Black's distinguishes between private and public reprimands:

The word is loosely used in different contexts and referred to differently by different courts all over the country, both state and federal. This inconsistency may create confusion as to whether one would need to notify the court of such instance when certifying one's status on the application. *See, e.g.,* *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988) (authorizing both informal and formal reprimands when determining appropriate Rule 11 Sanctions); *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1199 (9th Cir. 1999) ("We decline to find, however, that any time a court includes critical words about an attorney's conduct in an order, those words constitute a formal reprimand."); *see also* *Maddy v. First Dist. Comm. of Virginia State Bar*, 205 Va. 652, 654, 139 S.E.2d 56, 58 (1964) (expressing the ambiguous degree of conduct required to trigger a reprimand rather than a suspension of an attorney's license for "a pattern of unprofessional conduct").

Mr. Storms, familiar with the formal reprimand proceedings of the states in which he regularly practices, understandably may not have felt the need to report to this Court the two instances, which did not involve formal disciplinary proceedings. In general terms a "reprimand" can accordingly come in many forms, including, but not limited to, chastisement by a judge in open court, a court's written opinion criticizing an attorney for his conduct, or a public order declaring the attorney as reprimanded. However, this Court does note that it is quite clear that if an attorney goes through formal disciplinary proceedings with another court, such as a show cause or bar disciplinary hearing or has his license suspended, that the attorney must

---

**Private reprimand.** An unpublished communication between a disciplinary agency and a wrongdoing attorney, admonishing the attorney about the improper conduct. Sometimes a published reprimand that does not identify the lawyer by name is considered a private reprimand.

**Public reprimand.** A published notice, appearing usually in a legal newspaper or bar journal, admonishing the attorney about improper conduct and describing the impropriety for the benefit of other members of the legal profession.

*Private Reprimand*; *Public Reprimand*, Black's Law Dictionary (10th ed. 2014).

indicate such happenstances on his *pro hac vice* application. Despite being found to have repeatedly failed to follow local rules and engaged in "contumacious" conduct in ignoring court rules in Florida, and being "prohibited from making threatening or abusive statements to any employees of the Department of Veteran Affairs" in New York, neither the Southern District of Florida's Order nor the Eastern District of New York's Protective Order expressly indicated that Mr. Storms' conduct warranted formal disciplinary procedures.

Consequently, this Court finds that the two prior "reprimands" Mr. Storms' received were not the sort of instances which were required to be disclosed on the *pro hac vice* application. Nonetheless, the conduct for which Mr. Storms was chastised by the courts in Florida and New York do reflect a pattern of misbehavior by Mr. Storms that is of a piece with his conduct in the present litigation. As mentioned, this Court has the discretion to revoke an attorney's *pro hac vice* status if warranted based on the combined effect of an attorney's misconduct and disregard for the Local Rules. *See Aegon USA, Inc.*, 2010 WL 680340, at *4. Despite the fact that failure to report the New York and Florida incidents may not have been sanctionable, the Court considers Mr. Storms' behavior in this litigation with this background in mind.

In addition, the Court also evaluates Mr. Storms' conduct in light of this Court's previous experience with Mr. Storms arising out of an earlier discovery dispute between the parties. On May 12, 2015, A1 filed a "Motion to Compel the Defendants to Adequately Respond to The Interrogatories, Request for Production of Documents, and Request for Admissions." ECF No. 71. In its Order granting in part and denying in part the motion, the Court questioned Mr. Storms' good faith in attempting to resolve the discovery impasse: "It appears that instead of negotiating in good faith, A1 simply sent demand letters and then demanded compliance at subsequent conferences." ECF No. 94 at 2. This conduct is similar to that found by the court in

19

the Southern District of Florida when it found that Mr. Storms failed to confer or make reasonable efforts to confer with opposing counsel. *A1 Procurement, LLC v. Hendry Corp.*, *supra*, 2012 WL 6214546, at *3. In addition, this Court denied A1 relief on a number of its discovery claims where Mr. Storms improperly made unsupported allegations of misconduct against defense counsel: "Although A1's counsel made accusations that the Defendants were untruthful in their representation that they had produced all documents in their possession, A1 proffered no material evidence of such, beyond its accusations." ECF No. 94 at 4. This unprofessional conduct is similar to that addressed by the court in the Eastern District of New York, which issued a protective order prohibiting Mr. Storms from making threatening or abusive statements to the defendant. *Storms v. United States Dep't Veteran Affairs, supra.* Because of this behavior, despite granting the motion to compel in part, the Court declined to exercise its discretion to award attorney's fees in accordance with Fed. R. Civ. P. 37(a)(5)(C). *Id.* at 11; Local Civ. R. 37(a)(5)(C).

As a result, the Court cannot overlook the fact that Mr. Storms' failure to negotiate in good faith in this case, and his unwarranted behavior towards the defendants, is consistent with his past conduct. Though not the basis for determining whether Mr. Storms' *pro hac vice* status should be revoked, these prior instances of misbehavior provide context for the Court's evaluation of those acts of Mr. Storms which are the basis for the Court's recommendation.

B. Mr. Storms' Identification of His Brother's Apartment Residence as His Office, When it was Actually Just a Mail Drop, Reflects Adversely on Mr. Storms' Professional Fitness.

On August 24, 2015, the Defendants filed a Notice of Information, notifying the Court that Mr. Storms' address of record[15] was not an actual office but rather was his brother

---

[15] The Court notes that Mr. Storms has two addresses on file with the Court. In addition to his brother's apartment, Mr. Storms has an office in Miami, Florida, where this case originated.

Raymond's residential address, apparently an apartment in Brooklyn, New York. ECF No. 107

and attach. 1. The Defendants became aware of this information when they attempted to serve

Mr. Storms with a deposition subpoena. *Id.* Superior Services JD, Inc., the process server,

emailed the Defendants after the attempt, notifying that its agent spoke with Mr. Storms' brother

who "assured us that he would hand the subpoena to Mr. Storms . . . and to accept process in

hand on behalf of Mr. Storms." *Id.* attach. 1. The deposition never occurred because Mr. Storms

failed to appear. Hr'g Tr. at 7. According to the Defendants, Mr. Storms' brother told the

process server he was authorized to receive process for Mr. Storms, but "Mr. Storms did not

move to quash the subpoena. . . . [H]e simply failed to show up to his deposition, saying he had

never been served because of the address situation." *Id.* The Defendants argued that the issue

regarding Mr. Storms' residential address on record is relevant because it is "part and parcel of

the type of . . . contumacious behavior, willful delay" that warrants revocation. *Id.* at 14-15.

Under these circumstances, it is important to refer and cite directly to Mr. Storms'

representations at the hearing, whereat he provided the following explanation regarding his New

York office:

> THE COURT: All right. Well, tell me about your office, Mr. Storms.
>
> MR. STORMS: So, Your Honor, I moved to New York about three years ago
> from Florida. I initially started practicing law in Florida, had an office in Miami,
> moved up to New York. I initially moved into my brother's apartment, that's true.
> I still have a home office there -- not a home office -- well yeah, I have an office
> in my brother's apartment there. I use his mailbox for my mail because it's a very
> secure mailbox. I have the key; I check it daily. So that's why I have that address
> there, because that's my office address in New York.
>
> THE COURT: You have an office in your brother's apartment?
>
> MR. STORMS: Yes. It's just a room. I mean, it's not like a commercial office, it's
> just a room. I bring my laptop computer, and I use the mailbox. That's it.
>
> THE COURT: And do you have your own housing in New York?

MR. STORMS: Yes, I have my own housing in New York.

THE COURT: And the reason you don't use your own housing as your address?

MR. STORMS: The reason I don't use my own housing is because my housing -- the mailbox is outside, and it's not secure. And in my brother's apartment it's inside through a locking door, plus there's another lock inside. And it's just much more secure, so that's why I use that as my office address.

*Id.* at 25-26. Mr. Storms then denied receiving the subpoena, and denied that his brother was

authorized to receive service of process. *Id.* at 27-28. In response to the Defendants' assertion

that Mr. Storms' brother stated that he could receive service of process for Mr. Storms, the Court

asked Mr. Storms what role his brother had in receiving process at that apartment. *Id.* at 27. Mr.

Storms answered: "None ... Zero, Your Honor. My brother does not have auth – he never gave

me the subpoena, and he doesn't have any authorization. He's not part of my law firm. He just

lives there." *Id.* at 27-28.

After this representation, Mr. Storms then explained why he did not move to quash the

subpoena:

MR. STORMS: And under the rules you're supposed to serve somebody with a subpoena personally; otherwise, it's defective. That's why I didn't move to quash it, because there was never effective service.

THE COURT: Well, certainly, if you were going to serve a subpoena on the defendants, you would send it to their attorneys, correct?

MR. STORMS: Well, no, I mean, because that would just be a notice of deposition, but I'm not a party to the case. So, you know, if I was to serve a nonparty and I said, oh, you know, "Defendants, go serve your brother" or "your friend," here's the –

THE COURT: You're more than a nonparty, Mr. Storms, you're an attorney in the case. The attorney in the case should have an office, even if the office is in their home, where another side should be able to send them paper in the case and have it count.

It strikes the Court as almost bizarre that you would have a mail drop, if you will, where you could always assert, "Well, I never got it," because you have no one -- you have no, as most people think of it, office.

MR. STORMS: Well, I never asserted that, and I would never do that. You know, if I get mail, you know, I check it daily or within every two days.

*Id.* at 28-29.

Certainly it is no violation for an attorney to practice law out of his or her home. However, Mr. Storms' representation that his brother's apartment is his law office out of which he practices is not credible. The only indicia that Mr. Storms' brother's apartment is an office whereat Mr. Storms' conducts business is the fact that he receives all of his mail there. His representation that he brings his laptop and uses a room there is implausible. Inasmuch as he has his own residence in New York, Mr. Storms offered no explanation why he would travel to his brother's apartment to work on his laptop, instead of working out of his own home, and the Court can think of none. Apparently he receives mail at the brother's apartment, which he checks "daily or within every two days." Importantly, however, he does not receive process at the apartment. He has not authorized his brother to accept legal process at the apartment, although apparently his brother disagrees. As the Court noted, "[t]he attorney in the case should have an office, even if the office is in their home, where another side should be able to send them paper in the case and have it count." *Id.* at 28. It is problematic that Mr. Storms would represent that the residence of his brother is his law office, and then make it difficult if not impossible for the Defendants' counsel to contact him there. Moreover, Mr. Storms' representation at the hearing regarding how his brother's apartment is used as an office conflicts with his initial disclosure representation that all of the documents in this case are housed at his office. *Compare* Hr'g Tr. at 28-29 (stating about his office: "It's just a room. I mean, it's not like a commercial office, it's just a room. I bring my laptop computer, and I use the mailbox. That's it.") *with* ECF

No. 113 attach. 1 (stating in initial disclosures that the location of all the copies of documents that Relator may use to support claims or defenses in this case: "All of the foregoing documents are located at the law offices of Storms and Associates, P.A. at 143 13[th] Street, Ste. 4F, Brooklyn, New York 11215"). In any event, neither explanation is credible.[16] The former explanation reflects a misstatement to the Court; the latter, a misrepresentation to opposing counsel. Both explanations reflect poorly on Mr. Storms' fitness. Given also that service of process, by Mr. Storms' own admission, cannot be made at his "office," under these circumstances the Court must conclude that the address Mr. Storms has identified as his "office" is, in actuality, nothing more than a mail drop. Consequently, Mr. Storms' misrepresentation that his brother's apartment residence is his law office reflects adversely on his professional fitness.

## C. By Holding Himself Out as Practicing in the Law Firm of "Storms and Associates, P.A.," Mr. Storms Misrepresented His Status to the Public, Opposing Counsel, and the Court.

It appeared to the Court that Mr. Storms, a sole practitioner, was holding himself out as a named partner in a law firm with multiple attorneys by virtue of his firm name, "Storms and Associates, P.A." Consequently, on August 3, 2015, the Court ordered Mr. Storms to "be prepared to address [at the hearing] whether Relator's counsel's firm name of 'Storms and Associates, P.A.' comports with Prof'l Rules 7.1 and 7.5." ECF No. 97 at 1. Because the Rules of Professional Conduct apply to attorneys admitted *pro hac vice* to practice in the Eastern District of Virginia, the Court gave Mr. Storms notice that this subject would be addressed at the hearing. *Id.*; *see also* Local Civ. Rule 83.1(D)(2), (I) (referring nonresident attorneys to Section

---

[16] Apart from the implausibility that Mr. Storms would travel to his brother's apartment instead of staying at home to work on his laptop, the Court also notes that it would be a poor practice to leave important litigation documents at someone else's personal residence where the attorney has no control over who visits and therefore who might have access to confidential information.

II of Part Six of the Rules of the Virginia Supreme Court); Va. Rules Prof'l Conduct r. 7.1 (Va.

St. Bar 2009). Moreover, Paragraph B of Fed. R. Disciplinary Enf't IV, Standards of

Professional Conduct, attached as Appendix B to the Local Rules, provides:

> Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with any other person or persons, which violate the Virginia Rules of Professional Conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of any attorney-client relationship. The Rules of Professional Conduct adopted by this Court are the Rules of Professional Conduct adopted by the highest Court of the state in which this Court sits, as amended from time to time by that state Court, except as otherwise provided by specific Rule of this Court after consideration of comments by representatives of bar associations within the state.

Va. Code of Prof'l Responsibility DR appx. B.

Mr. Storms admitted at the hearing that he is a sole practitioner despite using the name

"Storms & Associates" during the entire pendency of this litigation.

> THE COURT: All right. Tell me about your law firm, Mr. Storms.
>
> MR. STORMS: So I started practicing law – I graduated law school about 2009 in Florida. Initially, I got together with another law student in Florida -- not a law student, another of my classmates. We started practicing together for about a year, so didn't really do much. I did a side business, did a little bit of law here and there.
> Then I took the New York Bar about two to three years ago, and I started practicing in New York. And it's just pretty much been me for the past three and a half years. Right now I'm just a sole practitioner.

Hr'g Tr. at 31.

The law on this issue is clear. Prof'l Rule 7.5(a) states, "A lawyer shall not use a name,

firm name, letterhead, or other professional designation that violates Rule 7.1."[17] Further,

section (d) states, "Lawyers may state or imply that they practice in a partnership or other

organization only when that is the fact." Va. Rules Prof'l Conduct r. 7.5(a), (d) (Va. St. Bar

---

[17] "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services." Va. Rules Prof'l Conduct r. 7.1 (Va. St. Bar. 2009).

2009). Virginia Bar Legal Ethics Opinions ("LEOs") also make clear that firms with names entitled "&/and associates" must have at least two other attorneys in the firm: "[I]t is improper for the firm to use the term "and Associates" in its identification unless the principal attorney employs at least two lawyers." Va. Bar, Legal Ethics Op. 1532 (1993); *see also* Va. Bar, Legal Ethics Op. 1492 (1992) (finding the use of "Attorneys at Law" by a solo practitioner to be misleading and in violation of the disciplinary rules); *In the Matter of Christopher Broughton Shedlick, Esquire*, 2009 WL 2906451, at *1 (Va. St. Disp. Op. June 8, 2009) (issuing the attorney a public reprimand because he used letterhead and business cards holding himself out to the public as having associates when in fact he was practicing as a sole proprietor and had no associates). Further, not only can an attorney not hold himself out as having associates when he or she does not, but if the attorney does have associates and those associates are not practicing attorneys, then the firm name is still improper. *Use of 'Associates' in a Firm Name*, ABA Comm'n on Ethics & Prof'l Responsibility, Informal Op. 402 (1961).

In response to the Court's Order to reconcile his law firm's name with the Virginia Rules of Professional Conduct, Mr. Storms made the following representations:

> THE COURT: Well, you're a sole practitioner. All right. Then address for me -- I believe in my order I told you to reconcile the name of your law firm with the Virginia Code of Professional Responsibility 7-5.
>
> MR. STORMS: Yes. I looked into that, Your Honor, and I saw that that could be an issue. I actually changed the name of my law firm -- I have the certification – just to Storms Law. So, hopefully, that's not an issue.
> I also filed the paperwork with this court by mail, because in order to do a name change you have to mail it in. And I have a copy of that letter.
> And I also called the Virginia Ethics Hotline. I spoke to Barbara Sanders about the situation. She's one of the ethics attorneys. And I had quite a bit -- a lengthy conversation with her. *What she told me was -- she said that she didn't think the rules of a name applied to a* pro hac vice *attorney, and she said the reason is because different states have different rules. And she said that unless you have a presence in the State of Virginia, such as advertising, an office, things like that, she didn't think the rule applied.*

But she also said that what she said is not binding on any court, particularly a federal court. *And I said to her, "Well, I think I should just change the law firm name just to be safe." She said, "I don't think you have to do that,"* but I said, "I'm going to do it, anyway." And that's what I did, because I don't want to have any issues.

Hr'g Tr. at 31-32 (emphasis added). This Court does not find credible Mr. Storms' representation to the Court that an ethics attorney for the Virginia State Bar advised him that certain Virginia Rules of Professional Conduct do not apply to nonresident attorneys admitted *pro hac vice*. As discussed *supra*, the Virginia Rules of Professional Conduct absolutely apply to all attorneys admitted *pro hac vice* to the Eastern District of Virginia Bar. The purpose of Rules 7.1 and 7.5 is to prevent attorneys from misleading the public, and the Court, about their status. This principle prohibiting misleading communications about the lawyer or the lawyer's services is equally important whether the attorney practices regularly in Virginia or solely on a *pro hac vice* basis.

The Court notes that Virginia ethics rules also prohibit attorneys from making false statements of fact to a tribunal. Va. Rules of Prof'l Conduct r. 3.3(a)(1) (Va. St. Bar 2009) (regarding candor toward the tribunal: "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal."). While it may be possible that Mr. Storms' grossly misunderstood Virginia bar counsel, it is much more likely that his representation to the Court about her advice to him is simply untrue. This conclusion is supported by the fact that the rule against misrepresenting the status of an attorney's law practice is the same, if not even more explicit, in Florida and New York, where Mr. Storms is barred, as it is in Virginia. In Florida, the ethics rule explicitly prohibits sole practitioners from holding themselves out as practicing with associates. Fla. Rules of Prof'l Conduct r. 4-7.21. Specifically, the Comment to Florida's Prof'l Rule 4-7.21(a), regarding false, misleading, or deceptive names, states, "A sole practitioner may not use

the term "and Associates" as part of the firm name, because it is misleading where the law firm employs no associates in violation of rule 4-7.13." The New York Bar's rules are similar: "A lawyer shall not hold himself or herself out as having a partnership with one or more other lawyers unless they are in fact partners." N.Y. Rules Prof'l Conduct r. 7.5(c);[18] N.Y. Code of Prof'l Responsibility DR 2-102(C); *see also* New York City Bar, *Frequently Asked Questions* (June 2010), *available at* http://www2.nycbar.org/Ethics/EthicsFAQ.htm ("[A] lawyer cannot imply that lawyers are associated in a law firm if that is not the case. Rule 7.1(c)(3))."). Though the Court appreciates that Mr. Storms changed the name of his law firm, it does not erase the fact that, by using the law firm name "Storms and Associates, P.A.," he has been making a clear misrepresentation to the public and the Court. As an attorney barred in Florida and New York, and admitted to practice in Virginia *pro hac vice*, Mr. Storms is charged with knowing and complying with the Rules of Professional Conduct. "[A]ttorneys practicing before this court are expected to know and to comply with the [professional] rules." *Wolt v. Sherwood, a Div. of Harsco Corp.*, 828 F. Supp. 1562, 1569 n.20 (D. Utah 1993); *Application of Mosher*, 830 F. Supp. 403, 404-05 (W.D. Mich. 1993) *rev'd*, 25 F.3d 397 (6th Cir. 1994) (noting that an attorney "cannot violate the Rules of Professional Conduct and then attempt to avoid the consequences of his violation by claiming ignorance. When it comes to the Rules of Professional Conduct, ignorance is *not* bliss"). The fact that he has been misrepresenting his status to the public and the courts in three separate states for years now, and represented to the Court that he received advice

---

[18] The Comment to New York Rule 7.5 additionally states:

> In order to avoid the possibility of misleading persons with whom a lawyer deals, a lawyer should be scrupulous in the representation of professional status. Lawyers should not hold themselves out as being partners or associates of a law firm if that is not the fact, and thus lawyers should not hold themselves out as being a partners or associates if they only share offices.

from a Virginia Bar ethics attorney which is patently incorrect, calls into question Mr. Storms' fitness to practice law in this Court.

D.  In Light of the Undersigned's Recommended Finding in ECF No. 116 that the Public Disclosure Bar Did Not Apply to Relator's SDVOSB Claim, Mr. Storms Therefore Likely Would Not Be a Necessary Witness in the Underlying Litigation.  Nonetheless, His Conflicting Representations with Respect to this Issue Raise Further Questions as to Mr. Storms' Fitness to Practice Law in this Court.

In Defendants' Notice of Information, ECF No. 107, in which Defendants disclosed that they tried to subpoena Mr. Storms for a deposition, the Court learned for the first time that Mr. Storms might be a necessary witness in the case.  At the hearing, the Court inquired as to this issue, and subsequently ordered the parties to submit post-hearing briefs "addressing what effect their attempt to depose Mr. Storms has on the Defendants' Motion to Disqualify, including whether Mr. Storms will be a necessary witness and the basis for that position." ECF No. 111 at 2.  In their Supplemental Brief, ECF No. 113, the Defendants argued that Mr. Storms should be disqualified under either Prof'l Rule 3.7(a) or 3.7(b).[19]  Mr. Storms contended that the Defendants subpoenaed him as a witness simply to harass him, and that he is not a necessary witness. ECF No. 114, Hr'g Tr. at 29.

The Court first acknowledges that the Defendants' attempt to subpoena Relator's attorney and their subsequent Supplemental Brief arguing that the Court should disqualify Mr. Storms because he is a witness in the case should be looked at with skepticism.  Motions to disqualify based on such "tactical weapons" such as disqualifying the lead attorney in a case are gravely subject to abuse.  *See United States v. Perry*, 30 F. Supp. 3d 514, 529 (E.D. Va. 2014) (noting that this is a well-documented concern of the court); Va. Bar, Legal Ethics Op. 1394 (1991)

---

[19] Defendants assert that this Court should find Mr. Storms ineligible to "act as an advocate" from the outset of the litigation under Prof'l Rule 3.7(a), but that if the Court disagrees with the Defendants' arguments as to Prof'l Rule 3.7(a), the Court should find that Mr. Storms is also ineligible to continue representing the Relator in the case under Prof'l Rule 3.7(b).  ECF No. 113 at 8.

(stating that the Ethics Committee "cautions that such tactics hold the potential for improper manipulation of the adversary process through the creation of a witness-lawyer who then is subject to the withdrawal or disqualification"). As a result, "[t]he decision to disqualify a defendant's chosen counsel is a serious matter and must be decided on a case-by-case basis." *United States v. Franklin*, 177 F. Supp. 2d 459, 464 (E.D. Va. 2001); *see also Arriba Corp. v. Bostic*, 69 Va. Cir. 505 (2002) (noting that courts ought not lightly deprive a party of the counsel of its choice); *Personalized Mass Media Corp. v. Weather Channel, Inc.*, 899 F. Supp. 239, 242 (E.D. Va. 1995) ("[T]hese ethical rules and the disqualification which results from their application must be considered in perspective of the fundamental principle that a party ought to be represented by its counsel of choice if that is at all possible."); Va. Bar, Legal Ethics Op. 1394 (1991) ("The question of whether adverse counsel 'ought' to call an attorney for the opposing side must be determined on a factual, case-by-case basis."). However, to preserve the integrity of the profession and of the pending matter, the Court can exercise its discretion and disqualify an attorney under appropriate circumstances. *See Franklin*, 177 F. Supp. 2d at 464. In this case, the undersigned has recommended finding that the claim involving the issue about which Mr. Storms' might have been a necessary witness – whether A1 Procurement, LLC was an original source of a previous public disclosure – was mooted. ECF No. 116. Since the undersigned recommended finding that no public disclosure occurred in connection with the SDVOSB claim, Mr. Storms likely is not a necessary witness. Consequently, the Court need not determine whether the Rules of Professional Conduct governing the attorney as witness are implicated. However, in light of the representations Mr. Storms made during the course of this litigation regarding his role in the case, the Court must examine Mr. Storms' conduct in the context of this issue.

To begin, Prof'l Rule 3.7(a) provides:

A lawyer shall not act as an advocate in an adversarial proceeding in which the
lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the
case; or
(3) disqualification of the lawyer would work substantial hardship on the client.

Va. Rules Prof'l Conduct r. 3.7(a). Essentially this provision corresponds with whether an

attorney should have disqualified himself from representation at the onset of the case. The

implication of Prof'l Rule 3.7(a) hinges on whether the attorney is likely to be a "necessary

witness" and, if so, whether one of the three exceptions applies. *Perry*, 30 F. Supp. 3d at 537;

*Teleguz v. Com.*, 273 Va. 458, 490, 643 S.E.2d 708, 728 (2007) ("Critical to the application of

this principle is the requirement that the lawyer be a necessary witness").

Prof'l Rule 3.7(b) states:

If, after undertaking employment in contemplated or pending litigation, a lawyer
learns or it is obvious that the lawyer may be called as a witness other than on
behalf of the client, the lawyer may continue the representation until it is apparent
that the testimony is or may be prejudicial to the client.

Va. Rules Prof'l Conduct r. 3.7(b). This provision comes into play when, after representation

has commenced, the attorney becomes aware that he or she may be called as a witness other than

on behalf of their client.

Defendants asserted that there is no bright-line rule to determine whether one is a

"necessary" witness at the outset of a case but that there are two principles emphasized

throughout the case law: (1) Whether the testimony would be non-tangential; and (2) whether it

would be unobtainable elsewhere. ECF No. 113 at 9. Based on these principles, the Defendants

argued that Mr. Storms was aware at the outset that he would likely be a necessary witness

because of his statements in his initial disclosures. *Id.* In Relator's Fed. R. Civ. P. 26(a)(1)

initial disclosures submitted on March 18, 2015, Mr. Storms identified himself as a person likely to have discoverable information used to support a claim or defense, including, *inter alia*, "communications with defendants" and "internal . . . investigation of Defendants." *Id.* attach. 1. Specifically, he was the only witness identified in the disclosures who purportedly had knowledge of "[i]nformation concerning liability and damages in this action. Investigation of Defendants' fraud, including communications with the Defendants, participated in internal and government investigation of Defendants." *Id.* The Defendants contended that this information is relevant to their affirmative defense that Relator A1 Procurement, LLC is not the original source of the public disclosure made to the Small Business Administration when A1 Procurement, JVS protested Thermcor's bid on a government contract as an SDVOSB. *Id.* at 10-14. According to the Amended Complaint, Adrian Batlle, A1's president at the time, telephoned Defendant Walter Dixon ("Mr. Dixon") requesting proof of Mr. Dixon's service-connected disability, whereupon Mr. Dixon allegedly admitted he was not a service disabled veteran. ECF No. 25, ¶¶ 49-50. This alleged admission to Mr. Batlle was part of the basis of the SBA protest, which Defendants have contended is a public disclosure.

The Defendants raised the attorney-as-witness issue with Mr. Storms on May 5, 2015 in a follow-up email requesting that Mr. Storms "withdraw immediately from representing A1 in this action" because of the likelihood that Mr. Storms would be a witness in this case in violation of the Prof'l Rules. ECF No. 113 attach. 2. Shortly after this notice, Mr. Storms retracted his representation that he possessed knowledge and amended his disclosures, omitting himself completely from the list of persons identified as having discoverable knowledge of claims or defenses. *Id.* attach 3. Notably, however, no other witness was disclosed as possessing

discoverable knowledge of the information and communications to which he originally stated he had knowledge. *Id.*

The Defendants point to *U.S. ex rel. Carter v. Halliburton*, a FCA case in which the defendants sought to compel production of the relator's disclosure statement. 266 F.R.D. 130, 132 (E.D. Va. 2010). The Court there held that the disclosure statement was privileged under the work product doctrine because the defendants failed to demonstrate a "substantial need" for the materials since they could obtain substantially equivalent information from other sources, including by deposing the relator. *Id.* at 134. Based on this analysis, the Defendants here argued that, since Mr. Storms is the CEO, sole shareholder, and only employee of A1, Mr. Storms "should have known he was subject to being deposed . . . because he knew that no one else had 'substantially equivalent' information." ECF No. 113 at 10.

In his Response to Supplemental Brief, Mr. Storms asserted that he was not a necessary witness at the outset of the case because the "Defendants did not notice or otherwise seek to take Mr. Storms' deposition or list him as a witness for trial until after such corrections were made." ECF No. 114 at 8. While this representation technically may be true, it is misleading because the Defendants notified Mr. Storms he would likely be a witness in the case before he amended the initial disclosures, even if they had not yet issued the deposition subpoena. ECF No. 113 attach. 2. It was because Mr. Storms identified himself as a person with knowledge that the Defendants advised him he was a likely witness. Moreover, the undersigned can only conclude that it was precisely because of this notification that Mr. Storms retracted his representation to them, claiming that it had been a "mistake." ECF No. 114 at 8, n.5. Based on his initial disclosure that he possessed certain discoverable knowledge about this case that no one else had, specifically knowledge of A1's internal investigation of and communications with the Defendants, the

Defendants contended that Mr. Storms should have known from the outset of the litigation that he would be a necessary witness. Alternatively, the Defendants contended that Mr. Storms at the least should have known he might be a witness once the Defendants asserted the public disclosure bar based on the SBA protest as an affirmative defense.

Subsequent to amending the initial disclosures, Mr. Storms claimed that the only information he possessed pertained to "the government's investigation and a settlement offer," both of which he argued are inadmissible at trial.[20] *Id.* at 9. Further, he argued that he has only acted as an attorney in this matter and therefore the sole source of his knowledge is through his role as attorney and that he "does not have discoverable information." *Id.* At the hearing, Mr. Storms explained his knowledge as follows:

> THE COURT: Apparently, you identified yourself as someone with knowledge in your initial disclosures.
>
> MR. STORMS: I did, and I explained what that was about. I identified myself because I was involved with the government's investigation. I was the only person that dealt with the Department of Justice, and, you know, things – I went up to Washington, D.C., I met with a U.S. Attorney, Patrick Kline. I was involved with the government's investigation.
> Then, when they saw that, they said, "Oh, we're going to remove you because you're a necessary witness." I said – they just said "witness," they didn't say "necessary." I said, "Wait a minute. I just disclosed that because I had knowledge of that, but that's not even relevant, and it's not even discoverable. I mean, you know, the government's investigation is confidential. That was my only role."
> And I explained that to them, and, based on that, I withdrew myself from the initial disclosures. And I told them that was my only role in the case, which is the role any lawyer would have. The only person at the company that dealt with any fraud was Adrian Batlle, not me.

---

[20] The "settlement offer" consisted of an email Mr. Storms sent to Mr. Dixon on August 9, 2011, accusing Defendant Thermcor of "fraudulently bid[ding]" on two SDVOSB set-aside contracts, and threatening to file a SBA protest "by 11:00 a.m. EST today" if Defendant Thermcor failed to withdraw one of the bids. ECF No. 64 attach. 1. Mr. Storms sent the email at 10:12 a.m. *Id.* Additionally, Mr. Storms offered to refrain from filing a qui tam action if Mr. Dixon paid A1 $469,857.83 in damages within three calendar days. *Id.* After warning Mr. Dixon of the Department of Justice's potential involvement, Mr. Storms cautioned "we cannot prevent the DOJ from instituting criminal penalties against you, which may include jail time and criminal fines." *Id.* Mr. Storms concluded his email: "I advise you to consult a civil and criminal attorney immediately." *Id.*

Hr'g Tr. at 30-31. Lastly, Mr. Storms argued in his Response to Supplemental Brief that Relator would prove its case against the Defendants solely through documentary evidence, apparently abandoning its earlier indication that the SDVOSB would be proven, in part, through the telephone communication with Mr. Dixon. ECF No. 113 at 3; Hr'g Tr. at 30, 98-99 (Mr. Storms stating at the hearing that this case got started because the Defendants could not prove they were service-disabled veterans after Mr. Batlle called their president and obtained information on the phone).

As the preceding recitation of events reveals, Mr. Storms' role in this case is unusually multi-faceted. Presently, he is both the client, as A1's sole shareholder, CEO, only employee, and the attorney for the client.[21] In effect, Mr. Storms is representing himself. Additionally, Mr. Storms' representations as to his role in this case have not been consistent. As discussed, in initial disclosures Mr. Storms represented that he had knowledge, *inter alia*, of discoverable information concerning communications with the Defendants and both internal and government investigations of Defendants in which he participated. He then represented, through an amended disclosure, that he had no knowledge of any discoverable information. At the hearing he represented to the Court that the only knowledge he possessed was through his involvement in the government investigation, which he argued was not discoverable. Obviously, as evidenced by his "settlement offer," Mr. Storms' knowledge about the case did not start with the government investigation. Importantly, left unreconciled was Mr. Storms' prior assertion regarding knowledge of "communications with the Defendants," and any internal, as opposed to government, investigation of Defendants. It is these subjects about which the Defendants sought

---

[21] According to Mr. Storms, A1 has been an inactive company for the past two years, but at the time of Mr. Batlle's alleged telephone conversation with Mr. Dixon, Mr. Storms was majority shareholder of A1, and Mr. Batlle was minority shareholder. Hr'g Tr. at 96-97.

Mr. Storms' testimony, and inasmuch as Mr. Storms is the only A1 owner/officer/employee who could address these issues, it is understandable that the Defendants wished to depose him.

Mr. Storms' shifting representations as to his involvement in this case may be due to the various roles he has played since the beginning of his involvement. At the time of the alleged conversation between Mr. Batlle and Mr. Dixon, Mr. Storms was Relator's CEO and the majority owner. Hr'g Tr. at 96. Presently, he is the only officer and employee, and is currently the one hundred percent owner. *Id.* Mr. Storms' role in this case simply cannot be limited to that of attorney, as he is both the attorney and the client. It is difficult to conceive how his knowledge in this case as an attorney can be divorced from his role as the client. Certainly a company cannot act except through its agent, be it an officer or owner. *See Pulliam v. Coastal Emergency Servs. of Richmond, Inc.*, 257 Va. 1, 24, 509 S.E.2d 307, 320 (1999) ("A corporation can act only through its officers and agents."); *Bank of U.S. v. Dandridge*, 25 U.S. 64, 92 (1827); *cf. Harrison v. Wahatoyas, L.L.C.*, 253 F.3d 552, 556 (10th Cir. 2001) ("[A] corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing *pro se*."); *Premium Products, Inc. v. Pro Performance Sports, LLC*, 997 F. Supp. 2d 433, 434 (E.D. Va. 2014) (noting that all corporations, including closely-held corporations must act through counsel). And, a lawyer does not act on behalf of a business client except through the instruction from the client. "[A] lawyer who is a material witness on a contested issue may be unable objectively to advise his or her client on, for example, settlement options or pre-trial stipulations, each of which contributes to the efficient administration of justice." *Estate of Andrews by Andrews v. United States*, 804 F. Supp. 820, 824 (E.D. Va. 1992); *see also Franklin*, 177 F. Supp. 2d at 467 ("An actual conflict of interest exists when the attorney had independent information about facts in controversy relating to his client and would,

therefore, be faced with the possibility of testifying."). Therefore, Mr. Storms, as attorney, could have acted and can only act at the behest of Relator's owner or officer, *i.e.* Mr. Storms himself. His various accounts as to the nature and extent of his knowledge, then, are inextricably bound up in the multi-faceted roles he is playing, which explains why those explanations have changed repeatedly. This conduct and the way Mr. Storms has blurred the lines between lawyer and client reflect poorly on his fitness to act as attorney in this case.

E. The Relator's Local Counsel Declined to Re-Endorse Mr. Storms' Professional Character and Good Standing.

Pursuant to Local Civil Rule 83.1(D)(1), all nonresident attorneys must have sponsorship from local attorneys to appear before this Court. Eric Cox ("Mr. Cox"), counsel for Relator and a member of the Bar of the United States District Court for the Eastern District of Virginia, petitioned for Mr. Storms' *pro hac vice* admission to this Bar and affirmed, *inter alia*, that Mr. Storms' "personal and professional character and standing are good." ECF No. 61 attach. 1. At all phases of the litigation, nonresident attorneys "shall be accompanied by a member of the bar of this Court" and must have local counsel sign and file all documents with this Court. Local Civil Rule 83.1(D)(3). Importantly, local counsel must be able to fulfill all responsibilities of *pro hac vice* counsel. *Id.*

At the hearing, the Court questioned Mr. Cox regarding his position with respect to the Motion to Revoke. After Mr. Cox stated that he had satisfied himself at the time of Mr. Storms' *pro hac vice* application that Mr. Storms was qualified for admission, Hr'g Tr. at 36-37, the Court addressed Mr. Storms' present fitness with Mr. Cox:

> THE COURT: All right. And are you still satisfied -- as long as you're up here, are you still satisfied that he possesses all of the qualifications required for admission and that his personal and professional character and standing are good?

MR. COX: I will admit that this whole case, the civil litigation, is not being handled as I would like it to. I know as local counsel that's partly on me. It's not being as civil as it could be.

THE COURT: Well, there's an understatement.

MR. COX: You know, Mr. Storms -- I'm not aware that he's ever lied to me, and whether he's misrepresented matters to the court, I think most or everyone here would agree it's a gray area, so at this point I need to stand by him.

THE COURT: All right. I think by your answer – I think, but correct me if I'm wrong, that if you were to be presented with a *pro hac vice* application you would still affirm those things that you've affirmed, and you'd still sign it. Is that right?

MR. COX: I would have to think about that, in light of what I know about how this case is progressing from both sides.

*Id.* at 36-37. When local counsel has worked for months on a case with a foreign attorney, and then declines to endorse the foreign attorney's personal and professional character, it speaks volumes as to that foreign attorney's fitness to practice before the Bar of the United States District Court for the Eastern District of Virginia.[22]

F. Conclusion

As the undersigned noted at the outset, a foreign attorney's ability to appear *pro hac vice* in the Eastern District of Virginia is a privilege, not a right, "the granting of which is a matter of grace resting in the sound discretion of the presiding judge." *Thomas*, 249 F.2d at 92. When a foreign attorney abuses that privilege by engaging in a pattern of unprofessional, uncivil and questionable conduct, the Court has an obligation to address it, and, if warranted, revoke the privilege. The undersigned does not recommend such action lightly, and, in fact, has been constantly mindful of Mr. Storms' due process rights, and cognizant of the stigma which may

---

[22] The Government, the real party-in-interest in this case, *see* ECF No. 95, did not oppose the Defendants' Motion to Revoke, representing to the Court that it "would not like to take a position." Hr'g Tr. at 39.

attach to revocation. *In re Davis*, 2012 WL 3782548, at *1. As noted previously, so long as the attorney is provided due process, the Court has the discretion to revoke an attorney's *pro hac vice* status based on the combined effect of the attorney's misconduct and disregard for the Local Rules. *See Aegon USA, Inc.*, 2010 WL 680340, at *4.

Mr. Storms' conduct necessarily has been viewed through the prism of both this Court's own experience with Mr. Storms and those instances from other jurisdictions where Mr. Storms has been severely chastised by other judges. This Court has previously found that Mr. Storms failed to negotiate a discovery dispute in good faith and engaged in unprofessional conduct when he made wholly unsubstantiated accusations of dishonesty on the part of the Defendants and their counsel. Federal Courts in Florida and New York similarly found that Mr. Storms' conduct was unprofessional and uncivil. Tellingly, Mr. Storms' local counsel, with the benefit of hindsight, could not say that he would support Mr. Storms' application for *pro vac vice* admission now, given Mr. Storms' conduct in the litigation to date. By his conduct, Mr. Storms has squandered the benefit of the doubt. It is in this context, then, that the Court evaluated Mr. Storms' behavior in recommending that his *pro hac vice* admission should be revoked.

Turning then to its findings, the undersigned has delineated in detail the specific instances of Mr. Storms' conduct that warrants this harsh sanction and will summarize accordingly here: First, Mr. Storms misled the Defendants and the Court by listing his brother's apartment as his law office, when it is actually just a mail drop. Mr. Storms used this misrepresentation to his advantage by denying the Defendants the ability to serve process there. Further, Mr. Storms undoubtedly misrepresented to the Defendants where relevant documents in the case could be located, and misled the Court at the hearing about the supposed uses of the room in his brother's apartment, all in an attempt to justify the misrepresentation that his brother's residence is his law

office.  Second, Mr. Storms misled the public, the Defendants, and the Court by holding himself

out as practicing in a law firm with at least two other attorneys, when in fact he has been a sole

practitioner for years.  Further, Mr. Storms misled the Court during the hearing by representing

that he had been advised by Virginia Bar Ethics counsel that Virginia Rule of Professional

Conduct 7.5 would not apply to him as a *pro hac vice* attorney.  Finally, Mr. Storms misled the

Court and the Defendants when he disclosed the fact that he had discoverable knowledge

regarding the Relator's internal investigation of and communications with Defendants, and then

denied such knowledge upon realizing the potential that he might be a witness in the case.  He

then misled the Court at the hearing when he represented that the only knowledge of any kind he

possessed pertained to the government's investigation.    Taken together, this behavior

demonstrates that Mr. Storms lacks the necessary personal and professional character and

standing entitling him to practice in this Court *pro hac vice*.

## IV.  RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that the Defendants' Joint Motion

to Revoke the *Pro Hac Vice* Admission of Derrick Storms, ECF No. 83, be **GRANTED.**  Relator

A1 Procurement, LLC shall continue to be represented by attorney Eric Cox pursuant to Eastern

District of Virginia Local Civil rule 83.1(D).

## V. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1.  Any party may serve on the other party and file with the Clerk of this Court specific

written objections to the above findings and recommendations within fourteen days from the date

this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C)

and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil

Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d).  A

party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. The Chief United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the Government and all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
November 18, 2015