

FILED

APR – 4 2017

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

A1 PROCUREMENT, LLC,

    Plaintiff-Relator,

v.         CIVIL ACTION NO. 2:15-cv-00015

THERMCOR, INC.,
WALTER L. DIXON,
RONALD L. DIXON,
WILLIAM M. BOLEAN,
TIMOTHY BOLEAN,
DALE BARNES,
And TLMG,LLC,

    Defendants.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This False Claims Act suit was brought by Plaintiff-Relator, A1 Procurement, LLC ("Relator" or "A1") on behalf of the United States against Defendants, Thermcor, Inc. ("Thermcor") and its owners, directors, and employees (collectively "Defendants"). A1 claims that Defendants are liable under the False Claims Act ("FCA"), 31 U.S.C. 3729, et seq., because they falsely certified Thermcor's eligibility for contract set-aside programs administered by the Small Business Administration ("SBA"). See First Amend. Compl. ¶¶ 87-112 (ECF No. 25). Because Thermcor was undisputedly enrolled in the relevant program, and its allegedly false statements related to eligibility were not material to the Government's payment

1

decisions, this Report recommends the district court grant the Defendants' pending motion for summary judgment (ECF No. 155), deny the Plaintiff's motion for partial summary judgment (ECF No. 158),[1] and dismiss the case.

## I.   BACKGROUND

Plaintiff-Relator A1 Procurement, LLC is a federal contractor who brought this qui tam action[2] on behalf of the United States. First Amend. Compl. ¶¶ 1, 5 (ECF No. 25). Defendant Thermcor, Inc. ("Thermcor") is a ship repair contractor specializing in marine insulation, and based in Norfolk, Virginia. Id. at ¶¶ 7, 44. The additional individuals named as Defendants are owners, officers, and/or employees of Thermcor, including its President and CEO Walter Dixon. Id. at ¶¶ 10, 12-15. A1 alleges that from 2007 to 2015 Defendants made false certifications to the Small Business Administration by misrepresenting or omitting information regarding Defendants' eligibility under two SBA set-aside programs, resulting in federal set-aside contract awards valued at approximately thirty million dollars. Id. at ¶ 1.

---

[1] The district court referred both motions pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

[2] A qui tam action is a civil action brought by a person or entity alleging a violation of the False Claims Act, 31 U.S.C. § 3729. The action is brought on behalf the United States Government, see 31 U.S.C. § 3730(b)-(c), and the person or entity bringing the claim is known as the "relator." See The False Claims Act: A Primer, Dep't of Just. 2 (Apr. 22, 2011). A relator can bring an action based on one of the acts listed in § 3729(a)(1), which includes knowingly making false or fraudulent claims to the Government. 31 U.S.C. § 3729(a)(1).

## A.    SBA Programs

There are two SBA administered programs at issue. First is the Service-Disabled Veteran-Owned Small Business ("SDVOSB") Set-Aside Program which was created by the Veterans Benefits Act of 2003, Pub. L. No. 108-183, 117 Stat. 2651, and provides for the award of set-aside and sole source federal contracts to service-disabled veteran-owned small businesses ("SDVOSB concerns"). First Amend. Compl. ¶¶ 26-27 (ECF No. 25); see also 15 U.S.C. § 657(f). To qualify as an SDVOSB concern, an individual must show that they have a service-connected disability, own at least 51% of the company, and control the management and daily business operations of an entity defined as small under 13 C.F.R. § 125.11.

To participate in, or remain eligible for SDVOSB contracts, participants are required to certify compliance with statutory and regulatory requirements. For example, an SDVOSB concern must represent that it complies with the SDVOSB status requirements when it registers with and bids for contracts through government procurement databases. First Amend. Compl. ¶ 27 (ECF No. 25). The government contracting officers select eligible contractors based in part on their website certifications. See id. at ¶ 28.

The second program at issue is the SBA's 8(a) Business Development Program which is intended to assist small businesses

3

owned by a "socially and economically disadvantaged" individual by offering their businesses sole-source, or set-aside government contracts while gradually positioning them to compete in the general marketplace.  See 15 U.S.C. §§ 631, 637(a)(4); 13 C.F.R. §§ 124.508-09; First Amend. Compl. ¶ 36 (ECF No. 25).  To obtain 8(a) status and participate in the program, businesses must show that they are owned and controlled by a "socially and economically disadvantaged individual," which is someone "who ha[s] been subjected to racial or ethnic prejudice or cultural bias within American society because of their identit[y] as [a] member[] of groups and without regard to their individual qualities" and "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities" as compared to non-socially disadvantaged persons.  See 13 C.F.R. §§ 124.103(a), 124.104(a).

In qualifying as a "socially disadvantaged individual," there is a rebuttable presumption that Asian-Pacific Americans - like Defendant Walter Dixon - are socially disadvantaged.  See 13 C.F.R. § 124.103(b).  To prove that the individual is also economically disadvantaged, the applicant must demonstrate diminished capital and credit opportunities by submitting a narrative statement and personal financial information.  Id. at § 124.104(b)(1).  The program requires that an individual's net worth be less than $250,000 upon entry, and remain below

4

$750,000 during participation. See id. at § 124.102(c)(2). The SBA annually reviews 8(a) participants, which submit renewal applications and supporting financial information certifying that they still comply with applicable regulations. Id. at § 124.112(b).

Participation in the 8(a) Business Development Program is capped by a term of nine years. Id. at § 124.2. Participants can "graduate" from the program early under certain conditions. See id. at § 124.302. For example, if the company makes "excessive withdrawals,"[3] the SBA may "early graduate" the participant because such withdrawals demonstrate ability to compete in the marketplace without assistance. See id. at (d). The participant can also graduate early if the owner's net worth exceeds the $750,000 cap. See id. at § 124.112. Participants can also be terminated from the program if they fail to comply or remedy non-compliance with SBA regulations. Termination and early graduation have the same net effect of precluding further eligibility for 8(a) set-aside contracts. Submitting false certifications of initial eligibility, post-admittance compliance, or continued eligibility are grounds for termination

---

[3] "Withdrawals" includes – for example – cash dividends, distributions in excess of tax liability, cash and property withdrawals, payments to immediate family members not employed by the Participant, bonuses to officers, and investments on behalf of the owner. See 13 C.F.R. § 124.112(d). During the times relevant in this case, withdrawals were deemed "excessive" if they totaled $300,000 during a given fiscal year. First Amend. Compl. ¶ 36. In 2011, that amount was increased to $400,000. See 13 C.F.R. § 124.112(d)(3).

from the 8(a) program. See id. at § 124.303(a)(1), (15). However, even when an applicant submits incomplete, inaccurate, or otherwise questionable information bearing on eligibility, the SBA does not automatically initiate termination or graduation procedures. See Duncan Dep. at 89:7-90:6 (ECF No. 185-1). The ultimate decision to early graduate or terminate an 8(a) participant is made at the discretion of the SBA. Id.; see also 13 C.F.R. § 124.304.

For 8(a) entry, the applicant must represent that they comply with the eligibility requirements, and then complete annual renewal applications to certify continued eligibility and compliance. First Amend. Compl. ¶ 41 (ECF No. 25); see App. for 8(a) Cert. (ECF No. 159-2, at 1-60). The participant must also submit personal, business, and financial information supporting its eligibility claims. See Thermcor 8(a) Annual Updates (ECF Nos. 159-3 through 159-9).

While the SBA is the sole entity that determines 8(a) eligibility, federal regulations provide multiple mechanisms by which 8(a) contracts can be advertised, negotiated, and awarded to program participants. See 48 C.F.R. § 19.800, et seq.. For example, government agencies soliciting goods or services can contract directly with the SBA, which in turn subcontracts with an 8(a) participant. Id. at § 19.800. The SBA can also permit the government agencies to solicit bids and negotiate directly

with 8(a) participants.  <u>See</u> <u>id.</u> at (f).  In this case, A1 has not proffered evidence showing the solicitation or award process for Thermcor's 8(a) contracts or what role, if any, the SBA played in formulating those contracts.  A1 simply alleges that Thermcor was awarded 8(a) contracts after being admitted into the program.  <u>See</u> First Amend. Compl. ¶¶ 45, 66 (ECF No. 25). Invoices proffered by A1 suggest that all of Thermcor's claims for payment were made directly to the government agencies who solicited the work, mainly the United States Navy and Coast Guard.  <u>See</u> Thermcor Invoices (ECF No. 159-46).

**B.   Thermcor's Alleged Fraud**

Thermcor was founded in October 2003 by Defendants Walter Dixon, Ronald Dixon, and William Bolean.  First Amend. Compl. ¶¶ 43-44 (ECF No. 25). Walter Dixon is an Asian-Pacific American and is a veteran of the U.S. Navy.  <u>Id.</u> at ¶ 36, n.2.  He is also the CEO and President of Thermcor.  <u>Id.</u> at ¶ 10.  At all times Walter Dixon owned 51% of the business.  <u>Id.</u>  A1 alleges that on at least two occasions in 2011 and 2012, Thermcor bid on SDVOSB set-aside contracts while falsely certifying it was eligible to do so.

Thermcor was also admitted to the SBA's 8(a) Business Development Program in 2007.  <u>Id.</u> at ¶ 45.  In 2008, Thermcor began receiving government contracts through the 8(a) program worth millions of dollars.  <u>Id.</u> at ¶ 66.  Beginning in 2009, A1

alleges that Thermcor made false certifications in its annual renewal applications aimed at concealing the company's noncompliance with 8(a) eligibility requirements.

### i.   Alleged SDVOSB Fraud

Thermcor's alleged SDVOSB fraud relates to two ship repair contracts that it bid on while purportedly representing itself as an SDVOSB concern. In June 2011, Thermcor bid on a Coast Guard contract ("Coast Guard contract") which was designated as a SDVOSB set-aside ship repair contract. Id. at ¶ 47.   On August 17, 2011, the Coast Guard informed A1, which had also apparently bid on the contract, that it intended to accept Thermcor's bid.   Id. at ¶ 48.   Plaintiff claims that the President of A1, Adrian Batlle, contacted Walter Dixon by telephone and requested proof of his service disability records from the VA.   Id. at ¶ 49.[4]   Believing that Thermcor was fraudulently representing its SDVOSB status, A1 filed an eligibility protest with the SBA on August 19, 2011.   Id. at ¶ 55.   On September 13, 2011, Thermcor contacted the SBA to inform them that it would be withdrawing its offer for the Coast Guard contract.   Id. at ¶56.   As a result of Thermcor's withdrawal, A1

---

[4] Thermcor claims that Walter Dixon received a phone call from someone claiming to be from the "Veteran's Affairs Verification Office," who asked him if he was a veteran.   Answer ¶ 13 (ECF No. 65).   Thermcor asserts that Dixon's status as a service-disabled veteran was never discussed on August 18, 2011.   Id.

withdrew its bid protest with the SBA and no further action resulted from the original bid.  See id. at ¶ 57.[5]

In October 2012, A1 alleges that Thermcor again represented on government procurement websites that it was a SDVOSB concern.[6] Id. at ¶ 58.  On December 17, 2012, the Department of Defense awarded Thermcor a ship repair contract ("Navy contract") that A1 claims was a SDVOSB sole-source contract.  Id. at ¶ 59.  To support its claim, A1 proffered a copy of an electronic document that appears to be a contract award summary from the Federal Procurement Data System website (www.fpds.gov), which details the Navy contract and identifies the "Type Of Set Aside" as "SDVOSB Sole Source."  See FPDS-NG Transaction Information for Solicitation N3220513R3000 (ECF No. 164-3).  To that end, A1 alleges that the Department of Defense relied on Thermcor's representation as a SDVOSB concern in awarding the Navy contract.  First Amend. Compl. ¶ 60 (ECF No. 25).

---

[5] Defendants asserted in their Answer that the bid was mistaken because Walter Dixon believed he qualified for formal designation as a service-disabled veteran.  Answer ¶ 12 (ECF No. 65).  However, Defendants later admitted in response to requests for admission that Thermcor was not SDVOSB eligible during the relevant times in this suit.  See Order denying Thermcor's request to amend admissions.  (ECF No. 165).

[6] Thermcor denies that it ever misrepresented its SDVOSB status on the CCR or ORCA websites.  Answer ¶ 16 (ECF No. 65).  According to Walter Dixon, the online certifications were automatically generated after responses to questions about his military service, ethnicity, and control of Thermcor.  Dixon Dep. 28:7-29:18 (ECF No. 168-1). As set forth elsewhere, Thermcor's SDVOSB eligibility is not material as the undisputed facts indicate the company did not receive payment on any SDVSOB contracts.

Thermcor did perform this Navy contract, but claims that the "SDVOSB Sole Source" designation on A1's exhibit is an error, and that the contract was in fact unrestricted (i.e., open to any bidder). To support its argument, Thermcor produced the actual solicitation of the contract submitted to and signed by the Navy procurement officer which designates the solicited contract as "unrestricted." See Solicitation for Contract No. N32205-13-C-3003 (ECF No. 155-4). Thermcor also provided the invoice submitted to the Navy for payment on the contract, which does not reference the SDVOSB program or make any other set-aside related certifications. See Invoice for Contract No. N32205-13-C-3003 (ECF No. 169-5).

Walter Dixon eventually obtained a service-connected disability rating from the Department of Veterans Affairs ("VA") on May 11, 2015. See VA Disability Rating Letter (ECF No. 155-1). The letter specifies that Dixon was disabled as a result of partial hearing loss and that his disability was service connected, but he did not have a VA determination letter at the time Thermcor allegedly bid on SDVOSB set-aside contracts. Id. Dixon had previously applied for VA benefits and was denied, although he stated in deposition that the denial was due to a missed appointment and not a substantive determination of non-disability. See Dixon Dep. 10:8-15 (ECF No. 168-1).

ii.  Alleged 8(a) Fraud

10

After A1 discovered the SDVOSB Coast Guard contract, Derrick Storms ("Storms") – then-counsel and CEO of A1 - began canvassing government procurement databases, social media, and other websites to determine whether Thermcor had, in his view, made any other fraudulent representations.  See Storms Dep. 52:18-56:15 (ECF No. 155-5).  From the government procurement databases, Storms was apparently able to see the total value of 8(a) contracts Thermcor had received since enrolling, which he estimated to be close to $30 million.  Id. at 81:15-20.  On Facebook, Storms found pictures of "expensive houses [and] cars" and "a lot of vacations."  Id. at 81:4-9.  He also discovered the existence of "side businesses" that were listed at the same address as Thermcor, and apparently controlled by Thermcor agents.  Id. at 81:25-82:5, 85:13-17.  Storms' investigation led him to conclude that Thermcor's owners and directors could not be economically disadvantaged because they "[l]ooked like they were wealthy," and the structure of the businesses "looked [sic] pretty clear evidence of a scheme and conspiracy to commit fraud."  See id. at 81:6; 82.

As a result of its investigation and discovery in this case, A1 argues that Thermcor made numerous false certifications to the SBA to fraudulently enter and maintain eligibility in the 8(a) Business Development program.  Specifically, A1 claims that Thermcor's false certifications concerned: (1) Non-disclosure of

11

directors and Walter Dixon's lack of control over Thermcor; (2) Failure to report affiliates and transactions with affiliates; and (3) Failure to disclose assets, capital, and compensation. See Pl.'s Mem. Supp. Mot. Partial Summ. J. 2 (ECF No. 159). A1 argues that if the SBA had been aware of the full scope of these misrepresentations, it would have either never admitted Thermcor into the 8(a) program or would have terminated its participation. Id. at 16-22.

First, A1 argues that in its initial application to participate in the 8(a) program, Thermcor was required to submit answers and supporting materials to questions that asked about the ownership and control of the business. For example, SBA Form 1010 in the application asked Thermcor to identify all owners, directors, management members, and officers. See App. for 8(a) Cert. (ECF No. 159-2, at 2). Similar questions about ownership and control were asked in the 8(a) annual updates that Thermcor was required to submit to the SBA. See, e.g., 2008 8(a) Annual Update, Question No. 6 (ECF No. 159-3) ("Business Structure/Ownership Changes"). A1 claims that for both its initial application and all subsequent renewal applications, Thermcor falsely certified that it had two directors, Walter Dixon and William Bolean.[7] See App. for 8(a) Cert. (ECF No. 159-

---

[7] Although not alleged in its first amended complaint, A1 now claims that Thermcor was never eligible for 8(a) participation because it was

2); 2008-2014 8(a) Annual Updates (ECF Nos. 159-3 through 159-9). It is undisputed that Walter Dixon is, and at all relevant times has been, a 51% owner of Thermcor. See App. for 8(a) Cert. (ECF No. 159-2, at 2); see also First Amend. Compl. ¶ 10 (ECF No. 25).

Concerning affiliate businesses, A1 alleges that in order to conceal the amount of money Thermcor and Walter Dixon made – thus remaining within the eligibility parameters of the 8(a) program – Defendants formed Thermcor Land Management Group[8] ("TLMG") and Thermcor Management and Leasing[9] ("TML") to retitle assets. Pl.'s Mem. Supp. Mot. Partial Summ. J. ¶¶ 26-32 (ECF No. 159). A1 argues that Thermcor failed to disclose these affiliates, the ownership that Thermcor agents had in them, and the transactions between the affiliates and Thermcor. Id.; see, e.g., 2010 8(a) Annual Update, Form 1010 Nos. 5, 7 (ECF No. 159-

---

actually controlled by as many as four directors – Walter Dixon, William Bolean, Ronald Dixon, and Richard McGrath - who have equal voting power. See Pl.'s Mem. Supp. Mot. Summ. J. ¶ 13 (ECF No. 159); Thermcor Dep. by Bolean 9:11-12 (ECF No. 159-45). In its interrogatory answers and various State Corporation Commission filings, Thermcor states that it had between two and four directors. See, e.g., Defs.' Resp. Third Req. Admissions, Nos. 26-35 (ECF No. 159-1); Nonetheless, Thermcor argues in its briefs that the company has only ever had two directors, and that any inconsistent statements were erroneous. See Defs.' Mem. Opp. Pl.'s Mot. Summ. J. (ECF No. 168); Feb. 13, 2007 Thermcor Board of Directors Meeting Minutes (ECF No. 169-4).

[8] In 2011, Thermcor transferred the real property it used as its main office and began paying rent to TLMG. First Amend. Compl. ¶ 72 (ECF No. 25).

[9] TML apparently leased equipment to Thermcor and provided management services, although it had no employees other than Walter Dixon and William Bolean. See Thermcor Dep. by Bolean 75:20 – 25 (ECF No. 159-45).

5, at 13).  This, A1 claims, "enabled Thermcor and Walter Dixon to fraudulently misrepresent reduced net worth and asset values in their annual 8(a) certifications."  First Amend. Compl. ¶ 68 (ECF No. 25).

Finally, A1 alleges that Thermcor also failed to disclose sources of capital, assets, and compensation to the SBA in its annual updates - many of which relate to the other allegations concerning control and affiliate businesses.  See Pl.'s Mem. Supp. Mot. Partial Summ. J. 9 (ECF No. 159).  For example, A1 claims that Thermcor did not disclose salaries paid to Ronald Dixon, which would be required if he was a director of Thermcor. See, e.g., 2008-2013 8(a) Annual Updates (ECF Nos. 159-3 through 159-8).  Similarly, Walter Dixon allegedly failed to disclose earnings he received from TLMG.  Id.  A1 contends that if the SBA had a full and accurate picture of Thermcor's finances, the company would have been terminated from the 8(a) program.

C.  SBA Inquiries and Proposed Early Graduation

Evidence proffered by both parties establishes that the SBA became aware of many of the alleged compliance issues and nonetheless retained Thermcor as an 8(a) participant until the natural expiration of its nine-year term.  First, the SBA's Inspector General's Office in Florida ("Florida IG") began an investigation sometime after A1 filed its original qui tam complaint in 2011.  See Duncan Dep. 92:6-25 (ECF No. 185-3).

14

The SBA Business Opportunity Specialist who oversaw Thermcor's participation in the 8(a) program, Florine Duncan ("Duncan"), was alerted to the qui tam action and its allegations by both the Florida IG and Thermcor itself. See id. at 95:11-13, 96:8-18.

Duncan stated that she had contacted Thermcor about excessive withdrawals as early as 2012, and emails with William Bolean show Duncan also inquired about TMLG, the Thermcor affiliate, in July 2014. See id. at 88:10-89:18; Email from Florine Duncan to William Bolean (ECF No. 164-9). Duncan also acknowledged during her deposition that information about TMLG, TML, and directors' income was included in tax information regularly submitted by Thermcor as part of its annual renewal applications. See Duncan Dep. 129:1-132:25 (ECF No. 185-3). Duncan testified that supporting documentation such as tax returns were an acceptable way to resolve conflicts in the renewal applications, and that she believed Thermcor had always provided adequate explanations when she had questions about their renewal applications. See id. at 118:1-119:25, 129:1-133:25 (ECF Nos. 185-3, 185-4).

Despite being aware of the Florida IG's investigation, the qui tam suit, and other compliance issues, Duncan consistently recommended Thermcor be retained in the 8(a) program until its final year. See, e.g., 2014 8(a) Annual Review Report (ECF No.

15

184-10). At the conclusion of the Florida IG's investigation, Duncan did send a letter to Thermcor stating that the SBA intended to early graduate the company in light of excessive withdrawals and the company's overall worth. See Feb. 10, 2016 Letter of Intent to Early Graduate (ECF No. 159-18). The recommendation was not based on a finding that Thermcor had falsified information - Duncan testified that early graduation is always about economic achievement. See Duncan Dep. 85:19-22 (ECF No. 185-1). Despite the recommendation, Thermcor was never early graduated and finished its nine-year term of SBA eligibility in October 2016.

## II.  STANDARD OF REVIEW

Defendants have filed a combined motion to dismiss and for summary judgment, asserting that all of A1's claims should be dismissed under either procedural avenue. (ECF No. 155). Under Federal Rule of Civil Procedure 12, "[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The decision to convert a motion to dismiss is at the discretion of the court, and occurs when the "court indicates that it will consider the extraneous materials." See Finley Lines Joint Protective Board v. Norfolk Southern Corp., 109 F.3d 993, 996 (4th Cir. 1997).

With respect to A1's 8(a) claims, however, most of

16

Thermcor's legal defenses were made in support of its motion to dismiss. Nonetheless, incorporating those arguments and proceeding under Federal Rule of Civil Procedure 56 is appropriate because the court has relied upon both the Defendants' legal arguments and exhibits submitted by both parties to resolve the cross-motions for summary judgment. Id.

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). If there is no genuine issue as to any material fact, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp., 477 U.S. at 323.

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and

17

identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger. 122 F.3d 58, 62 n.4 (1st Cir. 1997)). And in considering each individual

motion, the court must again resolve factual disputes and
rational inferences drawn therefrom in the light most favorable
to the party opposing that motion. Id.

### III. ANALYSIS

Plaintiff-Relator A1 argues that Thermcor is liable under
the False Claims Act because it falsely certified its
eligibility to participate in the 8(a) and SDVOSB programs. But,
viewing the facts in the light most favorable to A1, Thermcor's
conduct falls outside the scope of FCA liability because it did
not receive payments on any SDVOSB contracts, and its
eligibility certifications, whether false or not, did not relate
to the goods or services provided to the Government. Moreover,
the certifications were not otherwise material to the
Government's decision to pay the claims Thermcor made for
insulation and other services it rendered to the Navy, Coast
Guard, and related contracting agencies.

While the FCA imposes significant penalties on those who
defraud the federal government, "[it] is not 'an all-purpose
antifraud statute.'" Universal Health Services, Inc. v. United
States ex rel. Escobar, 136 S. Ct. 1989, 2003 (2016) (quoting
Allison Engine Co. v. United States ex rel. Sanders, 553 U.S.
662, 672 (2008)). In this case, the undisputed facts show that
Thermcor is entitled to judgment as a matter of law. Those same
facts, viewed in the light most favorable to Thermcor, establish

19

that A1's motion for partial summary judgment on liability
should be denied.

## A.   Public Disclosure Bar

As a threshold matter, Thermcor argues that A1's claims[10]
are barred because the factual allegations or transactions
underlying the suit were publically disclosed.   Specifically,
the company contends that all of its applications and
certificates were publically available and thus A1 merely relied
on public disclosures in asserting its FCA theories of
liability.

The public disclosure bar was designed to bar "truly
parasitic cases filed by relators whose complaints were based
upon public disclosure of [the] allegations."  S. Rep. No. 110-
507, pt. 1, at 5 (2008).  The FCA specifically states:

> The court shall dismiss an action or claim under this
> section, unless opposed by the Government, if
> substantially the same allegations or transactions as
> alleged in the action or claim were publicly
> disclosed:
>> (i)  in a Federal criminal, civil, or
>> administrative hearing in which the Government or
>> its agent is a party;
>> (ii)  in a congressional, Government
>> Accountability Office, or other Federal report,
>> hearing, audit, or investigation; or
>> (iii) from the news media,

---

[10] The court previously denied a Motion to Dismiss filed by Thermcor
where it argued that claim relating to the SDVOSB Coast Guard contract
was subject to the public disclosure bar.   See Mem. Order (ECF No.
126).

> unless the action is brought by the Attorney General
> or the person bringing the action is an original
> source of the information.

31 U.S.C. § 3730(e)(4)(A). When determining if a claim is subject to the FCA's "public disclosure bar," the court asks "i) whether there was a public disclosure, (ii) whether the relators' allegations are substantially the same allegations or transactions,[11] and (iii) whether the relators are entitled to original source status." United States ex rel. Beauchamp v. Academi Training Center, Inc., 933 F. Supp. 2d 825, 839 (E.D. Va. 2013), vacated and remanded on other grounds, 816 F.3d 37 (4th Cir. 2016).

A "public disclosure" occurs when information is made available to the general public, strangers to the fraud, or simply placed in the public domain through one of the FCA's enumerated sources. Beauchamp, 933 F. Supp. 2d at 840. The list of sources is exclusive.[12] Id. (quoting United States ex

---

[11] Prior to amendments made in 2010, the FCA required that the allegations be "based upon" the public disclosure. That language was replaced with "substantially the same[.]" This means that the public disclosure bar no longer requires actual knowledge of the public disclosure. United States ex rel. Beauchamp v. Academi Training Center, Inc., 816 F.3d 37, 40 (4th Cir. 2016).

[12] Prior to the 2010 amendments, the word "Federal" was not included in the statute. This led to a split in the circuit courts over the scope of the list, and the Supreme Court ruled that the list of sources in the prior version of the public disclosure bar - specifically the word "administrative" - included federal, state, and local proceedings. Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson, 559 U.S. 280 (2010). However, Congress' 2010 amendments abrogated the effect of the ruling on prospective public disclosures. Id. at 283 n.1, 302.

rel. Wilson v. Graham County Soil & Water Conservation Dist.,
528 F.3d 292, 300 n.3 (4th Cir. 2008)).   With respect to
"allegations or transactions" of fraud, "it is crucial to
recognize that to trigger the bar, a public disclosure must be a
disclosure of fraudulent 'allegations or transactions' and not
merely a disclosure of information."   United States ex rel.
Saunders v. Unisys Corp., No. 1:12-cv-00379, 2014 WL 1165869 *1,
*6 (E.D. Va. Mar. 21, 2014).   The D.C. Circuit provides a useful
explanation of how to analyze whether a disclosure is an
"allegation or transaction":

> [I]f X + Y = Z, Z represents the allegation of fraud
> and X and Y represent its essential elements.   In
> order to disclose the fraudulent transaction publicly,
> the combination of X and Y must be revealed, from
> which readers or listeners may infer Z, i.e., the
> conclusion that fraud has been committed.

United States ex rel. v. Springfield Terminal Ry. Co. v. Quinn,
14 F.3d 645, 654 (D.C. Cir. 1994).   In other words, to qualify
as a "transaction," the public disclosures must contain both a
misrepresented state of facts and true state of facts; the
inconsistency between the two leading the observer to conclude
fraud has occurred.   See id.

      If the relator's allegations are substantially similar to
information disclosed in one of the enumerated sources, then he
is barred from bringing those allegations unless he is the

"original source" of the information in the public disclosure. "Original source" is defined as:

> . . . . an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

Id. at § 3730(e)(4)(B) (emphasis added).

"The statutory touchstone [of the public disclosure bar] . . . is whether the allegations of fraud have been [publicly disclosed]." Graham County Soil, 559 U.S. at 298-300. And the bar is meant to 'strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits' in which relators simply feed off previous disclosures of fraud known to the public, rather than exposing independently discovered fraud. Saunders, 2014 WL 1165869 at *5 (citing Graham County Soil, 559 U.S. at 295)

In this case, the public disclosure bar does not apply to A1's complaint because the claims are not based on, or substantially similar to any allegations or transactions that were publicly disclosed. There is no argument or evidence that any allegation of fraud was publicly disclosed, but Thermcor contends that the transactions constituting fraud – namely the alleged false certifications and the 8(a) contracts allegedly

procured as a result – were public.   While some of the information A1 obtained about Thermcor's communications with the SBA was publicly disclosed, the "transactions" A1 describes were not.

With respect to the SDVOSB contracts, Thermcor argues that its self-certifications as an SDVOSB concern on government websites was a public disclosure.   For the purpose of this analysis, the court can assume that Thermcor is correct – that companies' certifications on these websites generate a report which is then available to the public at large.   However, that report only represents one of two parts in a "transaction," the set of facts that is purportedly false.   Again, a transaction requires a misrepresented state of facts and a true set of facts.   See Springfield Terminal, 14 F.3d at 654; see also Beauchamp, 933 F. Supp. 2d at 841.   The supposedly true set of facts which represents the second part of the "transaction" is A1's claim that Thermcor was not an SDVOSB-eligible concern because Walter Dixon did not have a VA disability rating letter. This was not learned through a public disclosure.   Indeed, A1 allegedly learned that Walter Dixon did not yet have a VA rating letter from Dixon himself.   Because one part of the transaction was not publicly disclosed the transaction itself was not publicly disclosed.

In regard to the 8(a) claims, Thermcor's arguments for the public disclosure bar present a closer question, but ultimately fail for similar reasons. First, none of the information obtained by A1 from the Defendants' social media accounts constitutes a public disclosure because it did not come from one of the enumerated sources in the statute. See 31 U.S.C. § 3730(e)(4)(A). This is particularly important because A1 CEO Storms testified that it was primarily the pictures of cars, houses, and other extravagances that led him to believe Walter Dixon could not be socially disadvantaged and, by extension, eligible for the 8(a) program. See Storms Dep. 81:4-9 (ECF No. 155-5).

The court will again presume that the information obtained from the government procurement websites, the state corporation filings, and the public 8(a) annual review documents were publicly disclosed records within the meaning of the FCA.[13] However, these documents did not reveal both sets of facts such that the entire "transaction" was revealed. The fraud alleged by A1 derives from the company's comparison of the represented facts contained in Thermcor's applications and its contracting history, with the alleged true set of facts which A1 surmised

---

[13] As set forth elsewhere, these public filings revealed some inconsistencies, which the SBA eventually resolved in favor of Thermcor, maintaining their eligibility as an 8(a) contractor. Thus, to the extent both sides of the "transaction" were publically disclosed, that transaction did not amount to fraud.

from its separate investigation of Thermcor's principals, and other information related to the company.  Because neither the allegation of fraud, nor the transaction purporting to reveal the fraud alleged were completely derived from public disclosures, A1's claim is not barred by the public disclosure bar.

## B.   False Claims Act Liability

The FCA imposes civil liability on anyone who "knowingly presents or causes to be presented, to . . . the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2), or "conspires to commit a violation of [the FCA]" 31 U.S.C. § 3729(c).  "A 'claim' includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs."  Escobar, 136 S. Ct. at 1996 (citing 31 U.S.C. § 3729(b)(2)(A)).

To prevail in a qui tam action, a plaintiff must show "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or

conduct caused the government to pay out money or to forfeit money due (i.e., that it involved a claim)." United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913 (4th Cir. 2003) ("Harrison II").

"The Supreme Court has cautioned that the FCA was not designed to punish every type of fraud committed upon the government." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) ("Harrison I"). Rather, the FCA imposes liability "not [on] the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" Id. (citation omitted). "Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government." Id.

Liability under the FCA is also subject to a "judicially-imposed" requirement that the false statement or claim be material. Id. "Material" means "having a natural tendency to influence, or be capable of influencing the payment or receipt of money or property." Escobar, 136 S. Ct. at 2002 (internal citations omitted). As the Supreme Court recently explained, "[t]he materiality standard is demanding":

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. . .

*Id.* at 2002.

Proof of materiality may include evidence that the defendant knows that the Government consistently refuses to pay claims "based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 2003. But when the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, "that is very strong evidence that those requirements are not material." *Id.*

i.   Theories of Liability under FCA

The parties disagree on exactly what theory of FCA liability A1 intends to pursue. A brief summary of the available theories will clarify the court's approach to summary judgment.

Originally passed during the Civil War to address abuses by defense contractors, the FCA sought to punish conduct where, for example, a company under contract with the government submitted a claim for payment that overcharged for the goods or services actually provided – the claim itself being literally false or fraudulent. See *Harrison I*, 176 F.3d at 784. But as the statute was amended over time, courts recognized broader theories of liability. And now, beyond the archetypal FCA claim concerning a fraudulent invoice, liability can attach in cases

28

of false certification (either express or implied) or fraud-in-the-inducement. Id. at 786-88.

False certification cases involve claims of fraud where the contract required compliance with certain conditions "as a prerequisite to a government benefit, payment, or program; the defendant failed to comply with those conditions; and the defendant falsely certified that it had complied with the conditions in order to induce the government benefit." Id. at 786. False certification can be express or implied. Express certification occurs where the contractor affirmatively certifies it complied with some condition – be it statutory, regulatory, or contractual - as a prerequisite of payment. Id. at 787 (citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997)). For example, if a claim for payment contained a signature block that stated, "By signing this invoice, you certify that you are in compliance with all applicable statutes," that would be an express certification.

Implied certification occurs where a defendant submits a claim but fails to disclose violations of statutory, regulatory, or contractual requirements, compliance with which is implicit in making the claim. Escobar, 136 S. Ct. at 1995. For example, in Escobar a mental healthcare provider submitted claims for mental health services rendered under the Medicaid program. The

claims included specific treatment codes which implicitly represented that the services were provided by appropriately licensed professionals. Id. at 1997. Under the implied certification theory, FCA liability attaches when: (1) "the claim . . . makes specific representations about the goods or services provided;" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." Id. at 2001.

Unlike false certification, fraud-in-the-inducement claims involve those instances where instead of making fraudulent claims for payment, a contractor makes false statements or engages in fraudulent conduct in order to enter into a contract relationship with the government. See Harrison I, 176 F.3d at 787. When an entity has induced the government to enter the relationship through fraud, FCA liability attaches to each "claim submitted to the government under [the] contract." Id. The seminal fraud-in-the-inducement case is United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943), where the Supreme Court held that contractors were liable under the FCA for all claims submitted under a contract, when that contract had been obtained through collusive bidding. See id. at 542 (emphasis added).

In this case, A1 has pled its claims under the implied
certification theory, arguing that Thermcor's claims for payment
on 8(a) contracts impliedly represented to the contracting
agency that it continued to be an 8(a) eligible contractor.
Again, the FCA imposes liability "not [on] the underlying
fraudulent activity or to the government's wrongful payment, but
to the 'claim for payment.'" Harrison I, 176 F.3d at 785. Thus
central question in FLA cases "is whether the defendant ever
presented a 'false or fraudulent claim' to the government." Id.

A1 has not offered evidence that Thermcor made any express
false certification of compliance with statutory, regulatory, or
contractual obligations on the claims for payment it submitted
to the Government. The contracts themselves are not part of the
summary judgment record, but A1 submitted dozens of invoices it
claims were falsely submitted to the Government for payment.
(ECF No. 159-46). All of these invoices are directed to Navy,
Coast Guard, or other contracting officials and none contain
express certifications related to Thermcor's continued
compliance with 8(a) eligibility criteria. Also, A1 produced
no evidence that the material and services described on the
invoices were not provided by Thermcor as stated in them. In
other words, A1's evidence of fraud relates exclusively to
Thermcor's eligibility as an 8(a) contractor, not its ability to

perform the ship repairs contracted by the Navy, Coast Guard, and other federal agencies.

Nevertheless, A1's counsel has argued that its claims are express certification claims because of the allegedly false certifications or misrepresentations made to the SBA concerning Thermcor's compliance with SBA eligibility criteria. See First Amend. Compl. ¶¶ 67-86; see generally Pl.'s Mem. Supp. Mot. Partial Summ. J. (ECF No. 159); Pl.'s Mem. Opp. Defs.' Combined Mot. (ECF No. 164). It is true that Thermcor made "express certifications" of compliance with 8(a) requirements in its annual 8(a) eligibility filings. See, e.g., 2008 8(a) Annual Update (ECF No. 159-3). But these express certifications were made to the SBA eligibility officials and not to the Navy, Coast Guard, or other contracting agencies. See, e.g., id.; Duncan Dep. 132:8-180:25. And those express certifications were not made as a "prerequisite for payment" on any contract. See Harrison I, 176 F.3d at 786. In short, even if these certifications were false, they were not "false claims." Instead, they involved only the company's continued 8(a) eligibility, and merely gave rise to an implication of compliance when Thermcor later made explicit claims for payment on 8(a) contracts. Stated differently, A1's argument is that because Thermcor bid on SDVOSB and 8(a) contracts which A1 claims Thermcor should not have been eligible to bid on or

perform, the company _implied_ continued compliance with SBA regulations when it made individual claims for payment on the contracts obtained as a result of its participation in the SBA programs.[14]  This is an implied certification claim, and it is subject to _Escobar's_ materiality analysis.  But applying _Escobar's_ "demanding" materiality standard confirms that A1 has not presented sufficient evidence to create a material issue for trial.

---

[14] In the pleadings and at the hearing on the parties' motions, A1 raised – for the first time – that it has sufficiently plead a fraud-in-the-inducement theory of liability.  However, considering the factual allegations made in the First Amended Complaint, A1 has failed to adequately plead such a theory.  Federal Rule of Civil Procedure 9(b) requires a claimant to plead fraud with particularity.  This means that the complaint must contain factual allegations that show the "'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  _Harrison I_, 176 F.3d at 784 (quoting 5 Charles Alan Wright and Arthur R. Miller, _Federal Practice and Procedure: Civil_ § 1297, at 590 (2d ed. 1990)).  Although A1 has since made arguments that Thermcor was never eligible to participate in the 8(a) program – citing Walter Dixon's alleged lack of control over the company – it failed to allege any facts in its First Amended Complaint concerning Thermcor's initial eligibility for the 8(a) program.  Indeed, all of the factual allegations in its First Amended Complaint concern conduct that occurred after Thermcor was admitted into the 8(a) program.  Without pleading facts of fraudulent behavior that induced the government to enter into the initial relationship with Thermcor, there can be no liability based on fraud-in-the-inducement.  Moreover, it is undisputed that Walter Dixon remained a 51% owner of Thermcor throughout the relevant time.  First Amend. Compl. ¶ 10 (ECF No. 25).  As such, he was deemed in control of the company under Federal Regulations.  _See_ 13 C.F.R. § 124.106(d)(1)(ii);  Williams Report ¶ 56 (ECF No. 155-2).  Accordingly, to the extent that A1 alleges it has stated a claim based on a fraud-in-the-inducement theory, this court would recommend dismissing those claims under FRCP 12(b)(6), pursuant to the particularity requirement of FRCP 9(b), or granting Thermcor's motion for summary judgment for the reasons set forth in Part III(B)(ii) _infra_.

The court accepts – for purposes of summary judgment – that A1's factual allegations create disputed issues of fact regarding whether Thermcor falsely certified its eligibility to the SBA officials evaluating its annual eligibility for SBA programs. But that does not resolve the question of whether any of those disputes of fact are material to summary judgment on its claims under the FCA. In order for them to be so, A1 must show that the false representations the company alleged would render Thermcor's claims for payment for insulation and other services performed on Navy and Coast Guard ships "misleading half-truths." Under the facts presented, and resolving all disputes of fact in favor of A1, the company has not met its burden on summary judgment to demonstrate a material issue for trial under its implied certification theory.

ii.  Defendants' Motion for Summary Judgment (SDVOSB Contracts & 8(a) Certifications)

1.  SDVOSB Contracts

The undisputed facts show that Thermcor is entitled to judgment as a matter of law on all of A1's claims involving SDVOSB contracts. Again, to succeed in an FCA case, the Relator must show "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or

34

conduct caused the government to pay out money or to forfeit money due (i.e., that it involved a claim)." Harrison II, 352 F.3d at 913.   Although A1 has proffered facts that suggest Thermcor was either directly or indirectly representing itself as a SDVOSB concern when it bid on the contracts, there is no genuine dispute of material fact about whether Thermcor was actually paid under a SDVOSB set-aside contract.   It was not.

With respect to the single Coast Guard contract award which A1 protested, Thermcor is entitled to summary judgment because A1 has produced no evidence that Thermcor's alleged conduct "caused the government to pay out money or to forfeit money due." See id.   Thermcor, after learning of A1's bid protest, withdrew its bid to perform the Coast Guard contract.   First Amend. Compl. ¶ 56.   Because Thermcor did not perform the contract, no claims for payment were made, and no money was ever forfeited by the Government.   Thus, the undisputed evidence shows that A1 cannot satisfy the fourth element of a viable FCA claim.

In regard to the Navy contract, Thermcor has produced uncontroverted evidence – the signed solicitation by the Navy procurement officer awarding Thermcor's bid and the invoice it submitted for payment under the contract – that shows the contract at issue was unrestricted, rather than an SDVOSB set-aside.   See Solicitation and Award for Contract No. N32205-13-C-

3003 (ECF No. 155-4); Invoice for Contract No. N32205-13-C-3003 (ECF No. 169-5). Although A1 produced an unauthenticated screenshot obtained from a procurement database which purports to represent details of the Navy contract, this does not create a genuine dispute of material fact over whether the contract and claims for payment were for an SDVOSB set-aside because the website screenshot purports to summarize the signed solicitation and invoice which clearly awarded Thermcor an unrestricted contract. In other words, A1 has not offered any admissible evidence to rebut the accuracy of Thermcor's signed solicitation or invoice. A1 speculates that this contract could have been modified after it was awarded, but it has produced no evidence to support this claim.[15] When a party moving for summary judgment produces evidence establishing a fact necessary to the plaintiff's case, the party may not rest on conjecture, but must produce admissible evidence demonstrating a dispute of material fact. Celotex Corp., 477 U.S. at 323.

Perhaps recognizing that the undisputed facts establish no payment to Thermcor under any SDVOSB contract, A1 also argues that Thermcor's alleged false representation of SVDOSB status nevertheless gives rise to liability for penalties and

---

[15] A1 merely cites to 48 C.F.R. § 15.206, which provides procedures for amending government contract solicitations. However, the fact that regulations permit modification does not create a genuine dispute of material fact of whether modification actually occurred.

attorney's fees. Pl.'s Mem. Opp. Summ. J. 28 (ECF No. 164). But this is incorrect. Forfeiture of money in some amount is a necessary prerequisite to a successful FCA claim. In its absence, A1 also has no claim for fees or penalties under the Act. See Nathan v. Takeda Pharmaceuticals of North Am., 707 F.3d 451, 454 (4th Cir. 2013) ("[T]o trigger liability under the Act, a clam must have been submitted, . . . resulting in 'a call upon the government fisc.'").

### 2. 8(a) Claims

The bulk of A1's First Amended Complaint is directed to its argument that Thermcor falsely represented its 8(a) status. To succeed under its implied certification theory for these claims, A1 must show that Thermcor's claims for payment: (1) ". . . ma[de] specific representations about the goods or services provided;" and (2) "the [] failure to disclose noncompliance with material statutory, regulatory, or contractual requirements ma[de] those representations misleading half-truths." Escobar, 136 S. Ct. at 2001. A1 has failed to satisfy both prongs of Escobar because the undisputed facts show that Thermcor made no false representations about the "goods or services provided," and any failure to disclose noncompliance with SBA eligibility criteria did not render the representations it did make about the goods and services "misleading half-truths." Accordingly, the conduct described in the First Amended Complaint was not

37

material to the Government's decision to pay Thermcor for the
work it performed under the 8(a) program.

### a. No false representations about the goods and services rendered

First, none of the alleged fraudulent conduct in this case
involves claims for payments that made specific false
representations about the goods or services rendered. See First
Amend. Compl. ¶¶ 67-86 (ECF No. 25); Pl.'s Mem. Supp. Mot.
Partial Summ. J. (ECF No. 159). The invoices in the summary
judgment record establish that Thermcor primarily worked on Navy
and Coast Guard contracts, installing insulation. See, e.g.,
Thermcor Invoices (ECF No. 159-46) (Invoice at 9, insulate
refrigeration line; Invoice at 17, install thermal insulation
and sound absorbing board; Invoice at 34, hull insulation, labor
and travel expenses for repairs to USCG Vessel VIGILANT). A1
has not argued or proffered evidence to show that Thermcor made
specific false representations about any of the goods or
services it provided to the Government, or that such
representations were impliedly false because of some undisclosed
violation of law. There is no claim, for example, that
Thermcor's workers were not properly licensed or supervised,
Escobar, 113 S.Ct., at 2000; no claim that the materials failed
to meet required government standards, see Abbott v. B.P. Expl.
and Prod., Inc., ___ F.3d ___, 2017 WL 992506 (5th Cir. 2017);

no argument that travel or other expenses were inflated or improper, see U.S. ex rel. Davis v. U.S. Training Ctr., Inc., 498 Fed. Appx. 308, 313-14 (4th Cir. 2012).

All of A1's allegations of fraud relate to certifications in, or omissions from Thermcor's 8(a) annual renewal applications, which are not claims for payment. A few of the invoices do reference the 8(a) program, or describe the company's earnings as 8(a) income. See Thermcor Invoices (ECF No. 159-46, at 1-4). But Thermcor was an 8(a) program participant when it submitted these claims to the Government. As a result, it did not falsely represent its 8(a) status to the Navy or Coast Guard or any other contracting agency.

The 8(a) program is not self-governing. Participants do not decide when and if they are in violation of regulations, should be removed from the program, or not bid on contracts. Eligibility is closely monitored by the SBA, and disputes over continued eligibility are contested before that agency which is vested with discretion to resolve them. So while A1 may insist that the SBA would, or should have terminated Thermcor from the 8(a) program, it did not. Thus, even if the court considered Thermcor's inclusion of "8(a)" on its invoices to the Government an express representation, it was not false, misleading, or even incorrect. The undisputed facts indicate Thermcor was an 8(a)

program participant and its participation was never revoked, or early terminated.

>    b.    Any alleged false representations were
>           not material to payment decisions

Because Thermcor did not falsely represent its status in submitting claims, A1's argument depends on whether the omissions in its eligibility filings would have rendered its representations about the good and services provided "misleading half-truths." Thermcor's claims for payment represented to the Government that it performed marine insulation and repair. Thermcor's failure to disclose its non-compliance with 8(a) regulations does not make those representations any less true. For example, the fact that Thermcor failed to accurately disclose an affiliate business or did not consistently report an income has no bearing on the actual ship-repair services Thermcor performed. Moreover, in light of the investigation conducted by SBA, and that agency's determination to retain Thermcor as an eligible 8(a) contractor, the financial disclosures challenged by A1 did not mislead the Government with respect to the goods and services Thermcor provided.

FCA liability only attaches where the omissions or misrepresentations were "material." Again, "material" means "having a natural tendency to influence, or be capable of influencing the payment or receipt of money or property."

Escobar, 136 S. Ct. at 2002 (internal citations omitted).  It is not enough that a violation would entitle the Government to refuse payment.  Id. at 2003.  In this case, the undisputed evidence shows that alleged regulatory violations were not material to the Government's decision to pay Thermcor because the SBA was aware of the conduct and consistently retained Thermcor in the 8(a) program.  Having subjected Thermcor to the review process under SBA regulations, the government likely could not refuse payment on the basis of conduct it already examined.  See Abbott, 2017 WL 992506, at *3 (affirming summary judgment on FCA claims where Department of Interior had investigated alleged construction certification errors and allowed rig operator to continue).  But even if the Government could have refused payment, the fact that SBA examined these disclosures, and took no action to remove Thermcor from the program is "strong evidence" that the inconsistencies in the financial disclosures were not material to the payment decision. See Escobar, 136 S. Ct. at 2002; Abbott, 2017 WL 992506 at *3.

     The three issues underlying A1's 8(a) eligibility challenge - director control, excess withdrawals, and related party transactions - were all disclosed to the SBA, and investigated by it.  And the information used to resolve each issue came from Thermcor's renewal materials themselves or from responses to SBA inquiries concerning the issues.  A1 seeks to cast Thermcor's

8(a) eligibility as a binary choice – a company violates a regulation and they are automatically ineligible – but the undisputed evidence shows that is not how the 8(a) program operates.

Both parties submitted expert reports describing the SBA eligibility process.  Report of Daryl Hairston ("Hairston Report") (ECF No. 155-6); Report of Jonathan T. Williams ("Williams Report") (ECF No. 155-2).  Predictably, the experts disagree regarding the impact of various financial discrepancies underlying the SBA's eligibility determination.  Plaintiff's expert, Daryl Hairston, described Thermcor's failure to disclose withdrawals, related transactions, and directors as "pertinent to the determination of the firm's initial and continuing 8(a) . . . eligibility."  Hairston Report, at 15 (ECF No. 155-6).  He opined that "if thoroughly investigated by the SBA, [he believed] Thermcor's participation would be terminated."  Id. Thermcor's expert, by contrast, explained that the discrepancies in Thermcor's annual submissions appeared "inadvertent and did not undermine Thermcor's 8(a) eligibility."  Johnson Report, at 17 (ECF No. 155-2).  But the fact that the two hired experts reached different conclusions on the likely significance of Thermcor's financial disclosures is immaterial in this case, because both experts agree that the entity charged with evaluating those disclosures is the SBA.  See Hairston Report,

at 15 (ECF No. 155-6); See also, Hairston Dep. __:23-__:4 (ECF
No. 155-3, 5-6); Johnson Report, at 4 (citing 13 C.F.R.   §
124.303(a) and Standard Operating Procedures Manual).   And in
this case the SBA did investigate and concluded that Thermcor
would remain eligible.

     The   parties   also   deposed,   at   length,   SBA   Business
Opportunity Specialist Florine Duncan, who conducted the annual
reviews of Thermcor's 8(a) eligibility and made recommendations
concerning its retention in the program.   Duncan Dep. 9:3-11:7;
86:10-87:11 (ECF No. 185-3).   Ms. Duncan testified that she had
investigated allegations of excessive withdrawals, id. at 88:10-
25, and related entities, including TMLG, id. at 91:5-92:25.   In
fact, Duncan was contacted by Thermcor after A1's lawsuit was
originally filed in Florida.   Id. at 95:2-96:18.   She was also
asked to investigate by the Florida IG, and therefore aware of
A1's allegations as early as November 2014.   Id.

     During   her   deposition,   Thermcor's   counsel   reviewed
Thermcor's   voluminous   filings   along   with   the   company's
eligibility applications to demonstrate that Thermcor's tax
returns and other supporting material contained information
revealing income to and from the related entities TMLG and TML
as well as the income representing the allegedly excessive
withdrawals.   This   examination   also   established   that   SBA
regularly contacted Thermcor for additional information when

discrepancies in its filings were noted, and that the company promptly responded with clarifying data.   See, e.g., id. at 132:8-180:25.   Most importantly, Duncan testified, after reviewing the financial filings in detail, that she continued to recommend Thermcor's retention in the program during each year they were under her supervision.  Id. at 181:2-9.

Plaintiff argues – as its counsel did with Ms. Duncan – that the SBA should have removed Thermcor in light of its incorrect filings, notwithstanding the additional material Duncan obtained.   But the CFR explicitly addresses situations where certifications are contradicted by other material in the SBA's files.   Id. at 193:5-195:8 (citing 13 C.F.R. § 124.108). The cited regulation provides:

> If, during the process of an application, SBA determines that an applicant has knowingly submitted false information, regardless of whether correct information would cause SBA to deny the application, and regardless of whether correct information was given to SBA in accompanying documents, SBA will deny the application.   If after admission to the program, SBA discovers that false information has been knowingly submitted by a firm, SBA will initiate termination proceedings and suspend the firm under Sections 124.304 and 124.305.

13 C.F.R. § 124.108(a)(5) (emphasis added).

This regulation addresses "knowingly" false statements, not incorrect statements contradicted by supplemental filings.   And it reinforces the conclusive nature of SBA review.   The regulation does not create a freestanding right for third

parties to re-litigate 8(a) eligibility of their competitors. Instead, it vests the SBA with discretion to "determine[]" whether the applicant "knowingly submitted false information." After reciting this rule, A1's counsel asked Duncan if she considered it to apply to the review she undertook with Thermcor. She responded that if the company "had submitted information that needed to be questioned, then I would go to the firm [Thermcor] first." Duncan Dep. 195:4-8 (ECF No. 185-6). Counsel then asked Duncan directly whether she ever found that Thermcor provided false information and she responded "No." Id. Counsel asked the question again:

> Counsel: So sitting here today [January 18, 2017] and taking into account what you learned from the IG in Florida and so forth, is it your belief that Thermcor never provided the SBA with false information in the 1010s or 1450?
>
> Duncan: I didn't find false information.

Id. at 195:24-196:6 (objection by opposing counsel omitted).

Because the SBA officials charged with evaluating Thermcor's eligibility filings concluded that the company did not knowingly misrepresent its eligibility,[16] the discrepancies

---

[16] In addition to removal from 8(a) eligibility, federal law provides an entirely separate mechanism for sanctioning knowing of false statements to the SBA. Under Title 18 U.S.C. § 1001 and Title 15 U.S.C. § 645, any person who misrepresents a firm's status as an 8(a) Program participant or SDB concern, or makes any other false statement in order to influence the certification process in any way shall be: (1) Subject to fines and imprisonment of up to 5 years, or both, as stated in Title 18 U.S.C. § 1001; subject to fines of up to $500,000 and imprisonment of up to 10 years, or both, as stated in Title 15

noted in support of A1's claims could not be material to the separate payment decisions made by the Navy or Coast Guard. As a result, A1 has not met its burden to demonstrate a dispute of material fact on the materiality of Thermcor's already-examined 8(a) eligibility filings.

## IV.  **RECOMMENDATION**

For the foregoing reasons, this Report recommends that the district court GRANT IN PART Defendants' Combined Motion (ECF No. 155), enter summary judgment in favor of Thermcor on all claims, and DENY Plaintiff-Relator's Motion for Partial Summary Judgment (ECF No. 158).

## V.  **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another

---

U.S.C. § 645; (2) Subject to civil and administrative remedies, including suspension and debarment; and (3) Ineligible for participation in programs conducted under the authority of the Small Business Act.

party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. _Thomas v. Arn_, 474 U.S. 140 (1985); _Carr v. Hutto_, 737 F.2d 433 (4th Cir. 1984); _United States v. Schronce_, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

April 4, 2017